1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

10

11  YTY INDUSTRY SDN, BHD,            )    Case No. CV-05-08881-SGL (AJWx)
                                      )
12                Plaintiff,          )
                                      )
13        v.                          )    ORDER GRANTING IN PART AND
                                      )    DENYING IN PART DEFENDANT'S
14  THE DOW CHEMICAL                  )    MOTION FOR SUMMARY JUDGMENT
    COMPANY,                          )
15                                    )
                  Defendant.          )
16  _____ )

17        Presently before the Court is defendant Dow Chemical Company's ("Dow") motion

18  for summary judgment, plaintiff YTY Industry's SDN BHD ("YTY") opposition, and Dow's

19  reply thereto.  For the reasons set forth below, the Court hereby **GRANTS IN PART** and

20  **DENIES IN PART** Dow's motion for summary judgment.

21                              I. BACKGROUND

22        Dow Chemical Company ("Dow") is the manufacturer of various chemical products,

23  amongst which is polyurethane.  Many of the proprietary chemicals made by Dow are later

24  used by the company in creating other products that it then sells to customers thereby

25  ensuring a market for the chemical.  For instance, in connection with its production of

26  polyurethane, Dow developed a patented polyurethane dispersion (PUD) process for use

27  in the manufacture of a separate product, disposable synthetic polyurethane gloves (PU

1  gloves) sold under the brand name INTACTA.[1]  Given its proprietary rights to the chemical,
2  Dow was the only source of the PUD raw material used to produce these synthetic PU
3  gloves.  YTY Industry SDN BHD ("YTY") is a leading Malaysian glove manufacturer
4  producing a diverse range of high-quality medical examination gloves from latex-based to
5  synthetic medical exam gloves.

6  A.    Manufacturing Agreement and Later Negotiations to Sell PU Glove Business[2]

7        In 2001, Dow entered into a contract arrangement with YTY for it to manufacture PU
8  gloves for Dow using PUD raw material supplied to it by Dow; Dow would then take the PU
9  gloves produced by YTY and market and sell them worldwide, primarily in the United
10 States.  During the second half of 2002, Dow began considering selling its synthetic PU
11 glove business.  In an August, 2002, internal company memorandum, Dow's head of its
12 United States PU glove business, Mike McGaugh, commented that company superiors
13 were threatening to shut down the business and "now is the time to ask for forgiveness."
14 By January, 2003, Dow had decided to get out of the PU glove business altogether, just a
15 few weeks before its largest gloves customer in the United States --- Maxxim Medical, Inc.
16 ("Maxxim")  --- declared bankruptcy.  Dow considered and rejected selling its business to
17 one of its affiliates, explaining in an internal memorandum, "Why would it want to put its
18 head in a noose?"  Instead, Dow approached YTY about the possibility of the company
19 purchasing Dow's PU glove business given that YTY was already doing all the legwork in
20 producing the gloves themselves.

21

22 _____

23      [1] The gloves are used in the healthcare field and to clean rooms.  These gloves
   generally do not produce allergic reactions the way latex gloves can.

24      [2] Given that the applicable legal standard for considering a motion for summary
25 judgment has long past become firmly established, the Court will only briefly remind the
   reader: Summary judgment can be granted only where there is no genuine issue as to any
26 material fact and where the movant is entitled to judgment as a matter of law; in
   determining whether these conditions are met the record must be viewed in the light most
27 favorable to the party opposing the motion, with the court indulging in all inferences
   favorable to that party. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S.
28 242, 255-56 (1986); Brookside Assocs. v. Rifkin, 49 F.3d 490, 492-93 (9th Cir.1995).

1    Dow's pitch to YTY in this regard was made during a January 24, 2003, meeting

2    that took place between YTY's board of directors and Dow's head of its PU business in

3    Asia, Stephen James, at the Ritz Carlton hotel in Kuala Lumpar, Malaysia.  Mr. James

4    informed the YTY board that, "while Dow's PU glove business was profitable and growing,

5    the sale of end products was generally not the type of business Dow was involved in, [but

6    rather] preferred to concentrate on the manufacture and sale of [the] bulk chemicals" for

7    such end products once those products had become established.  It is alleged that, during

8    this meeting to convince the YTY directors to agree to the proposal, Mr. James

9    represented that the PU glove business "had been highly successful for Dow and was a

10   tremendous business opportunity," that "the demand for [the] gloves was strong and

11   growing," Dow was "ready, willing, and able to supply YTY's needs for the raw material[,

12   the PUD,] on a long-term basis," and the "cost of the . . . raw material was going down"

13   and would continue to go down as Dow "would begin producing the [raw material] at a

14   more efficient, and cost-effective, plant in Dalton, Georgia."  With respect to the last point,

15   it is alleged that Mr. James further represented that the "cost savings" that would be

16   achieved on the price for PUD "was to be at least $.20 (U.S.)/kg (wet)," a point that Dow

17   disputes it made.

18       In making his sales pitch, however, Mr. James cautioned YTY's board on their need

19   to act quickly.   According to at least one YTY board member, Mr. James informed them

20   that Dow wanted to sell off its PU glove business by the end of the first quarter of 2003,

21   and that it was willing to sell the business at a reduced price to YTY if it were to enter into

22   the transaction without conducting any due diligence (a process that would make

23   completion of the sale before the end of the first quarter problematic) beforehand.  Mr.

24   James warned the YTY board that should it ask for and require Dow to provide such

25   documentation to perform a due diligence it would tie up the transaction into the second

26   quarter and that, consequently, any price advantage YTY could have obtained from quickly

27   seizing on the transaction would be lost.  As the YTY board member recounted:

28

1       Mr. James further stated that time was of the essence,
2   and that Dow needed to close this transaction by [March 31,
    2003].  Mr. James said that, although Dow was talking to two
3   other potential buyers of the glove business, YTY could buy the
    business at a lower price than these other bidders because
4   YTY already had an existing partnership with Dow on the PUD
    gloves by virtue of the contract manufacturing agreement . . . .
5   [and thus] would not need to conduct "due diligence" . . . .  He
    said that if YTY were to conduct due diligence, the deal would
6   not be able to close by March 31, 2003, and YTY would lose a
    distinct advantage it had over the other two bidders.

7   (Decl. Wan Kuan Yoi ¶ 20).

8      When Mr. James told the YTY board that it would gain a permanent cost savings of

9   at least 20¢ per kilogram on the price of the PUD due to Dow transferring its commercial

10  production of the same to its Dalton, Georgia, plant within six to nine months from the

11  acquisition, he knew that the basis underlying that representation was flawed because,

12  among other things, (1) Dow at the time had yet to make a decision on whether to transfer

13  PUD production to the Dalton plant, (2) Dow had not expended or even authorized the

14  capital expenditures required to make the plant capable of producing PUD, (3) had not

15  obtained the necessary FDA approvals to allow such production at the plant, and (4)

16  understood that it would take at least 18 to 24 months to make the Dalton plant capable of

17  producing the PUD once approval for the transfer had been made (which again it had not

18  done by the time Mr. James made the representations in question).  Similarly, just a week

19  before Mr. James made the above representations to the YTY board, Dow's head of its

20  United States PU glove business, Mr. McGaugh, prepared an internal presentation of

21  Dow's actual financials for the PU glove business, revealing the huge losses Dow had

22  incurred for this business.  Eight days later, however, Mr. McGaugh prepared a different

23  "Power Point" presentation for outside consumption, which supposedly altered Dow's

24  financial information for the PU glove business by showing that it was profitable.  Mr.

25  James used the "new and improved" financial information in making his January 24, 2003,

26  presentation to YTY's board.

27     During the next three months, the parties negotiated the terms of a potential

28  purchase of Dow's PU glove business.  During these negotiations, YTY did not ask to

4

examine Dow's books and did not ask to see its financial statements or sales records, ledgers, projections, forecasts, or other Dow records related to its PU glove business in particular or Dow's business in general.  At no time during this negotiation process did Dow refuse any request from YTY for information about its PU glove business.  Instead, YTY hired an accounting firm to provide a tax opinion, but it did not ask the firm to assist with any due diligence.  YTY also hired a Malaysian lawyer to review the contracts.  The lawyer advised YTY that there were "material issues involved" and provided the company with questions and comments about the draft agreements prior to the close of the transaction. When later asked whether anyone at YTY read the Malaysian lawyer's memo before the agreements were signed, the company's finance director and a member of its board of directors, Loi Heng Lim, testified, "Not to my knowledge."  YTY did not request that any changes be made to the agreements based on the Malaysian lawyer's comments.  B.   The Sale of the PU Glove Business

s

to

Y

T

Y

The sale of Dow's PU glove business to YTY closed on March 28, 2003, with the execution of three agreements:  An Asset Acquisition Agreement  (effectuating the sale of Dow's PU glove business to YTY), a Technology Agreement (related to the use of Dow's secret patented PUD process), and a Sales Agreement (wherein Dow agreed to supply YTY with its patented PUD raw material).  Under the combined terms of the parties' agreements, YTY acquired Dow's existing inventory of approximately 70 million PU gloves and the technology to the manufacture more gloves, and Dow agreed to supply the patented PUD raw material to YTY critical for the manufacturer of the gloves.  All three agreements were drafted by Dow.   The intent of the parties in entering into these three agreements was to enter into a long-term relationship whereby Dow would supply the patented PUD raw material to YTY, and YTY would produce, market, and sell the PU gloves made from that material.  The need for a long-term commitment arose out of the fact that Dow was the only source of PUD, the basic raw material needed for the production of PU gloves.

Pursuant to the Asset Acquisition Agreement (which contained a merger clause at paragraph 15.1 and which was to be governed by Michigan law), YTY purchased for $9 million Dow's customer lists and other business assets, including its inventory of PU gloves and the trademark INTACTA used in marketing and selling its PU gloves.  The Asset Acquisition Agreement further provided in paragraph 7 that "Dow shall endeavor to supply to YTY full and complete and accurate details of the Customers and shall let YTY have the Customer List, it being the intention of the parties that YTY shall be at liberty to obtain the custom of the Customers and the persons listed in the Customer List."  The customer list referred to was annexed to the agreement at the time it was signed.  The Asset Acquisition

1   Agreement did not contain any express guarantee by Dow as to the value of, or the

2   prospects for, the PU glove business.  Furthermore, the Asset Acquisition Agreement

3   contained in paragraph 9 the following: "Dow will do such acts and things and execute

4   such deeds and documents as may be necessary to fully and effectively vest YTY the

5   Assets and to assure to YTY the rights hereby agreed to be granted."  The merger clause

6   in the agreement (referenced previously), however, did not relieve Dow from any pending

7   or yet to be completed obligations it may have had vis-a-vis YTY prior to closing.

8          The Sales Agreement (which also contained a merger clause at paragraph 12(a)

9   and which was to be governed by Michigan law) provided that YTY agreed to purchase its

10  requirements for the patented PUD polymer from Dow, with no minimum purchase

11  obligation for the first five years, and YTY received the right to purchase the patented PUD

12  polymer from Dow for a minimum 10-year period.  The Sales Agreement further set forth a

13  base price for the patented PUD polymer of $1.33/wet kg.  Paragraph 4 of the Sales

14  Agreement set forth the terms and conditions under which Dow could increase the per unit

15  price for the patented PUD polymer:

16              Dow may increase the price . . . by giving [YTY] at least 90
                days prior notice.  These changes will be deemed acceptable
17              unless [YTY] objects in writing before the effective date.  If
                [YTY] objects, then Dow will within 45 days notify [YTY]
18              whether (a) Dow will continue to sell on the previous terms or
                (b) Dow wishes to negotiate the changes with [YTY].  During
19              any negotiations, price and other terms will be those which Dow
                implemented by notice.  If negotiations are not finalized within
20              45 days after the effective date of the change, then either [YTY]
                or Dow may terminate the Contract by written notice.
21

22  Furthermore, paragraph 7 of the Sales Agreement stated in large caps that neither party

23              WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, PUNITIVE,
                SPECIAL, EXEMPLARY OR INCIDENTAL DAMAGES. [YTY'S] EXCLUSIVE
24              REMEDY FOR CLAIMS (INCLUDING BREACH OF WARRANTY,
                NEGLIGENCE AND STRICT LIABILITY) IS LIMITED TO [YTY] HAVING THE
25              OPTION OF REPLACEMENT OR REPAYMENT OF THE PURCHASE PRICE
                PAID FOR THE PRODUCTS WHICH ARE THE SUBJECT OF THE CLAIM.
26

27  C.      Unraveling of PU Glove Business

28

7

1   Shortly after the transaction a number of different problems developed that would

2   contribute to an unraveling of the parties' tri-parte arrangement.

3   Not surprisingly, one of those problems was that YTY faced an immediate and

4   precipitous fall off in demand for the PU gloves due to the gloves' largest customer,

5   Maxxim Medical, filing for bankruptcy in mid-February, 2003 (Maxxim Medical was later

6   acquired by Medline in late 2003).  On February 9, 2003, just a week before the

7   bankruptcy filing, and while YTY and Dow were still in negotiations over the sale of Dow's

8   PU glove business, YTY received an e-mail from its glove broker/master distributor in the

9   United States, Adenna, informing it that Maxxim Medical "is filing for restructuring this

10  coming Tuesday, and will proceed to break up the company divisions to sell off.  Glove div

11  is still the first one to go."  Several weeks before the sale of the PU glove business's March

12  28, 2003, closing date, YTY and Adenna discussed the possibility of purchasing Maxxim

13  Medical's glove division but ultimately decided against making such a move.  YTY was not

14  concerned about Maxxim Medical's financial difficulties and its intention to sell its glove

15  division.  In fact, a YTY board member stated that the company "paid no heed to it," felt it

16  "wasn't a problem," and that such a restructuring could even increase Maxxim Medical's

17  capital.  After the purchase transaction with Dow closed in March, Maxxim Medical

18  continued to place orders for PU gloves in line with YTY's expectations, and after the

19  sale's close, Maxxim Medical purchased in the ordinary course of business the entire

20  existing inventory of PU gloves YTY had acquired from Dow in the transaction for

21  approximately $2.8 million.  In August, 2003, YTY and Maxxim Medical entered into a

22  limited distributorship agreement, pursuant to which Maxxim Medical agreed to purchase

23  100% of its requirements for PU gloves exclusively from YTY for the next three years.

24  Sales to Maxxim Medical, however, dipped in the last quarter of 2003 and continued to lag

25  into mid-2004, when Maxxim Medical was acquired by Medline Industries, Inc.

26  Nonetheless, by the end of 2004, orders from Maxxim/Medline increased to pre-

27  bankruptcy levels.

28

1    Another problem that YTY encountered was related to the quality of and timeliness

2    with which Dow supplied the patented PUD polymer.  Much of this was due to the fact that

3    Dow decided not to maintain any inventory of its patented PUD polymer, and when YTY

4    began ordering substantial quantities of the raw material in the summer of 2004, Dow

5    immediately began having problems supplying YTY with the material on a reliable basis.

6    By late 2004, the orders for PU gloves YTY was receiving was close to its original

7    projection.  However, because of Dow's failure to provide the raw material on a reliable

8    basis, YTY was unable to supply its customers with the gloves.  Ultimately, YTY's

9    customers cancelled orders for PU gloves in excess of 56 million units.  In January, 2005,

10   YTY's largest customer, Medline/Maxxim, decided to terminate its contract with the

11   company because YTY could not guarantee a reliable supply of the gloves.  On May 20,

12   2005, the parties entered into a settlement agreement whereby Dow agreed to write off

13   approximately $323,000 owed by YTY and, in exchange, YTY agreed to release Dow from

14   liability for its quality claims about the patented PUD polymer.

15   While this supply bottleneck issue was ongoing, a Dow employee produced an

16   internal memorandum in June, 2004, analyzing how the production demands and cost

17   overlays were affecting Dow's bottom line in supplying the PUD raw material to YTY under

18   the current contractual arrangement:

19       Current case:  Selling @ $0.513/wet Lb
         Production cost - $0.74/wet Lb to $0.80/wet Lb + $0.10/wet Lb
20       shipping = $0.84-0.90/wet Lb.  Thus we are losing a minimum
         of $0.33/wet Lb sold.
21
         What are our options? 1) Exit the business via price increases
22       2) Obtain permission from YTY to sell PUD G2G to others.
         We can't continue selling at below costs to YTY. . . .  Selling the
23       product to other regions at higher prices maybe the only option
         for long-term product financial viability.  We should explore the
24       value of the exclusivity since the YTY demand is not high
         enough to support the product.
25       Given these conditions, I would propose the following as the
         path forward.
26       1) Obtain exclusivity relief from YTY to sample other
         customers. . . . 2) On December 1, 2004, notify YTY of a price
27       increase effective March 1, 2005.  We'll need to discuss the
         merits of fewer but larger price increases vs many small price
28       increases.  I would recommend fewer but larger price

1
2
3

> increases.  Clearly the dynamics of the marketplace are not what Dow or YTY expected.  However, our ability to make any margin and squeeze at least an additional $0.33 of cost out/wet Lb is not feasible.  If we are to continue supplying YTY at low volumes the G2G is the preferred product.

4
5
6
7

Dow never asked YTY to waive its market exclusivity.  Additionally, Dow never produced any second generation (otherwise referred to as "G2G PUD") patented PUD polymer material, nor did it ever transfer production of its material to the Dalton plant.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Instead, Dow altered the price it charged for the patented PUD polymer during the course of the parties business arrangement after consummation of the asset sale transaction.  In February, 2004, Dow agreed to lower the price of the patented PUD polymer by 20¢ to $1.13 per wet kg for a one-year period to help YTY "recover business momentum."  On November 19, 2004, just little more than four months after the internal memorandum quoted above, Dow notified YTY that, effective March 1, 2005, it was raising the price for the patented PUD polymer by over 90¢ to $2.04 per wet kg.   Dow proffered as a reason for the price increase the rising cost of benzene and methyl diphenyl disocyanate ("MDI"), chemical precursors necessary to producing PUD.  A dispute exists over whether this proffered rationale is true.  Regardless, the parties thereafter negotiated about the proposed price increase, during which time YTY continued to buy the PUD polymer for the discounted price of $1.13 per wet kg.  Indeed, after February, 2004, YTY never paid more than $1.13 per wet kg for the patented PUD polymer delivered to it by Dow.   When the parties were unable to agree upon the terms of a price increase after several months of negotiations, Dow terminated the Sales Agreement by letter dated June 9, 2005, with the proviso that it was willing to continue to supply the PUD polymer to YTY on a "spot price basis."

25
26
27
28

Six months later, on December 22, 2005, YTY filed the instant action, alleging claims for, among other things, breach of the Sales Agreement and Asset Acquisition Agreement, breach of the implied covenant of good faith and fair dealing, rescission, innocent misrepresentation, negligent misrepresentation, fraudulent concealment, fraud,

1  and promissory estoppel.[3]  In essence, YTY argues that Dow was aware of the financially

2  dire situation its largest glove customer Maxxim Medical was in, but refused to inform YTY

3  about it, that Dow exaggerated the profitability of the gloves business thereby enticing it to

4  enter into the transaction, and that once entered into Dow acted in bad faith in both its

5  supplying of and the price charged for the PUD raw material.

6       As damages for its breach of contract claims, YTY seeks the profits it would have

7  made over the 10- or 20-year period covered by those contracts (that is, lost profits) but for

8  Dow's alleged breach.  As damages for its tort claims, YTY similarly seeks to recover the

9  lost profits it would have made during the lifespan of the parties contract were it not for

10  Dow's allegedly tortious conduct.  In particular, Dow's alleged exaggerations of profitability

11  are tied to the statements Mr. James made during the January 24, 2003, meeting in Kuala

12  Lumpar with YTY's directors.

13                              II. ANALYSIS

14  A. Breach of Contract Claims[4]

15       YTY argues that Dow breached the Sales Agreement through its late delivery of the

16  patented PUD polymer raw material, its raising of the price for the PUD raw material, and

17  its termination of the contract itself.  YTY further argues that Dow breached the Asset

18  Acquisition Agreement by failing to disclose "full, complete, and accurate" financial

19  information about the financial health (or lack thereof) of its customers, namely, Maxxim

20  Medical which was teetering on the verge of bankruptcy when the parties entered into

21  negotiations over the sale of Dow's glove business to YTY.

22  _____

23       [3]  YTY also brought claims for breach of fiduciary duty and constructive fraud, but
     those claims were later dismissed by the Court.

24       [4]  YTY argues that the Court should read all three contracts as one, and interpose

25  terms and provisions in one to the rights and obligations of the parties arising under the
     other contracts.  There position is without merit.  Courts will interpret separate documents
     as a cohesive whole when those contracts relate to the same subject matter.

26  See Omnicon of Michigan v. Giannetti Inv. Co., 221 Mich.App. 341, 346 (1997).  Here,

27  however, the three contracts, while related to one another in the broad sense of seeking to
     effectuate the sale of Dow's PU glove business, cover distinctly different subject matter —

28  the licensing of Dow's intellectual property, a supply agreement, and a sale of assets.
     Accordingly, the Court does not read the three singularly.

1   Dow responds by arguing that YTY does not have a viable claim for breach of the

2   implied covenant of good faith and fair dealing, as no such claim exists under Michigan

3   law.  (Mot. Summ. J. at 5 n.2 ("Michigan law does not recognize a separate cause of

4   action for breach of the implied covenant of good faith and fair dealing apart from a claims

5   for breach of the contract itself")).  Although mistaken on this point, Dow's ultimate

6   conclusion that YTY does not have a viable claim is well-founded.

7   An implied covenant of good faith and fair dealing in the performance of contracts is

8   recognized by Michigan law, but only where one party to the contract makes its

9   performance a matter of its own discretion.  See Belle Isle Grill Group v. City of Detroit,

10  256 Mich.App. 463, 476 (2003); Stephenson v. Allstate Ins. Co., 328 F.3d 822, 826 (6th

11  Cir. 2003); Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 876 (5th

12  Cir.1989) (applying Michigan law); James v. Whirlpool Corp., 806 F.Supp. 835 (E.D.

13  Mich.1992) (applying Michigan law).  In recognizing an implied covenant, Michigan courts

14  have at the same time sought to protect the reasonable expectations of the contracting

15  parties; thus, if the parties commit something to writing in their contract, those provisions

16  control and no covenant of good faith will be superimposed upon those express contract

17  terms.  Discretion arises (and hence an implied covenant claim may exist) when the

18  parties have agreed to defer decision on a particular term of the contract.  As the court

19  approvingly quoted in Stephenson:

> Discretion in performance arises in two ways. The parties may
> find it to their mutual advantage at formation to defer decision
> on a particular term and to confer decision making authority as
> to that term on one of them. Discretion also may arise, with
> similar effect, from a lack of clarity or from an omission in the
> express contract. In either case, the dependent party must rely
> on the good faith of the party in control. Only in such cases do
> the courts raise explicitly the implied covenant of good faith and
> fair dealing, or interpret a contract in light of good faith
> performance.

26  328 F.3d at 326 (quoting Hubbard, 873 F.2d at 877 n.2).

27  By the same token, courts have declined to ascribe a covenant of good faith and fair

28  dealing in the interpretation of a contract "to override express contract terms."  Cook v.

1   Little Caesar Enter., Inc., 210 F.3d 653, 657 (6th Cir.2000). Consequently, when the

2   parties have "unmistakably expressed their respective rights," as in the case at bar, the

3   covenant does not adhere. Hubbard, 873 F.2d at 877; see also Clark Bros. Sales Co. v.

4   Dana Corp., 77 F.Supp.2d 837, 852 (E.D. Mich. 1999) (the implied covenant does not

5   supersede the express terms of the parties contract and cannot form the basis for a claim

6   independent of that contract).

7         Superseding express contract terms is precisely what YTY seeks for the Court to do

8   in this case.  The Sales Agreement set forth a specific procedure to be used in raising the

9   price of PUD that spells out each parties' respective rights:  Dow's right to raise the price

10   with notice, YTY's right to object, Dow's right to enter into negotiations concerning that

11   objection, and each side's respective right to terminate the contract should those

12   negotiations breakdown.  Understandably, YTY takes exception to the motivation for Dow's

13   price increase, suggesting that the contract right was exercised simply as a ruse to

14   terminate the contract itself (a suggestion strongly supported by the June, 2004, internal

15   Dow memorandum and Dow's subsequent conduct in conformity therewith).  That,

16   however, does not take away from the fact that the right and procedure to increase the

17   sales price of PUD was explicitly spelled out in the parties' contract.  Nowhere in the terms

18   of the contract was there any mention or proscription on the motivation for or that the

19   amount of the price increase be governed or taken in good faith by Dow.  YTY's related

20   argument that there was an "explicit and continuing good faith covenant" contained in the

21   parties' agreement --- namely, the contract provision that "Dow will do such acts and things

22   and execute such deeds and documents as may be necessary to fully and effectively vest

23   in YTY the Assets and to assure to YTY the rights hereby agreed to be granted" --- is

24   mistaken as it seeks to incorporate a term contained in the Asset Acquisition Agreement

25   into the Sales Agreement.  As explained above, the parties' contracts are separate from

26   one another and are not to be read as a single cohesive whole.  Moreover, the term from

27   the Asset Acquisition Agreement YTY seeks to use to impose such a contractual good

28   faith requirement upon Dow concerned a topic (Dow ensuring that YTY received all the

1   assets, that is, the customer lists, existing inventory of gloves, and trademark) completely

2   different than the one at issue in this case (Dow's ability to charge the price for PUD).  One

3   cannot transpose a contract term covering one subject matter to an unrelated area that is

4   lacking in any explicit similar contractual term calling for the exercise of good faith.

5       Accordingly, the implied covenant for good faith is inapplicable and YTY's claim in

6   that regard is **DISMISSED**.

7       Next, Dow argues that YTY does not have a viable claim for breach of contract on

8   the Sales Agreement, as the form of damages it seeks from its claim ("general and

9   consequential damages" (First Am. Compl. at 27)) is precluded under that contracts'

10   damage exculpatory clause, which precludes recovering any "consequential, punitive,

11   special, exemplary or incidental damages" arising from the performance under the

12   contract.  Instead, the Sales Agreement limits such claims to the replacement value of the

13   patented PUD polymer raw material that was purchased or the repayment of the material's

14   purchase price.

15       Although Dow correctly notes that such limitation of damage clauses have been

16   upheld by Michigan courts (the contracts have a Michigan choice of law provision), YTY

17   argues that the problem is that the types of claims being brought by it (breach of contract

18   claims relating to Dow's alleged late delivery of the PUD, its raising of the price for PUD,

19   and its termination of the contract after the parties negotiation concerning the price

20   increase fell apart) do not relate to defective products (which it argues is what the clause is

21   limited to); moreover, to the extent that the claims involve the patented PUD raw material

22   supplied by Dow, they concern claims for supply of and price for the products themselves.

23   In other words, YTY seeks to limit the damage exculpatory clause to defective product

24   claims; any claim outside a defective supply of PUD, YTY argues does not fall within the

25   clause's provisions.

26       Although the limitation on damage provision concerns only the Sale Agreement-

27   related breaches of contract, the Court does not share YTY's narrow reading of the

28   clause's scope, a reading that does not comport with the provision's all-inclusive language.

14

1    Simply put, there is no mention in the provision that its terms are limited to "defective"

2    product contract claims.  Instead, the provision states that it applies to all "claims (including

3    [for] breach of warranty, negligence and strict liability)" that arise from the sale or supply of

4    the product.  (emphasis added).  There is nothing in the provision's terms evincing any

5    intent to limit the type of claims its terms cover.  The recital of breach of warranty and strict

6    liability claims were proffered as exemplars, not as defining the class of claims to which the

7    provision applied.  Again, the provision speaks of claims in general and then simply notes

8    that, among the broad class of claims covered, the clause covers ones for warranty and

9    strict liability.  The only argument advanced for reading the provision as ambiguous

10   involves YTY's previously rejected effort to have the Court read all three agreements as

11   one cohesive whole.  YTY asks:  "[E]xactly how does replacement or repurchase of

12   defective PUD apply to assets or technology?"  (Opp. at 10).  The simple answer is that it

13   does not; the exculpatory clause is limited to claims brought under the Sales Agreement,

14   not those covered by the Asset Acquisition Agreement or the Technology Agreement.

15          That the provision begins by noting that "neither party" will be liable for such forms

16   of damages indicates that its terms are reciprocal and not simply a one-way street.

17   Nowhere does YTY explain how it could have a "defective product" claim brought against it

18   by Dow.  The reciprocal nature of the provision indicates that the breadth of claims

19   covered by its terms went well beyond those concerning defective products.  YTY's related

20   argument that the limitation of damages clause should not be enforced because it would

21   shield Dow from its own willful misconduct is misplaced, but its line of attack on the

22   remedies provided by the exculpatory clause does bear some merit.  The clause permits a

23   remedy for YTY — the replacement value of the product just not the one they prefer.  The

24   problem is the nature of the remedies enumerated would appear to suggest a "one-way

25   street."  It is much more difficult to conceive of a remedy amenable to any claim Dow may

26   have against YTY that would adequately be compensated by the limited remedies

27   available in the exculpatory clause.  Indeed, the nature of the remedies made available

28   seem limited to only those instances involving defective or tardily tendered raw material, a

1   defective products claim, than to any that could be brought by Dow.   The Court need not

2   resolve this issue as YTY's breach of contract claim predicated upon breaches of the

3   Sales Agreement is without merit for a more fundamental reason.

4        YTY has put forward no evidence to substantiate a breach of the Sales Agreement

5   (outside of that wrapped up in its previously rejected covenant of good faith argument).

6   The acts taken by Dow in increasing the sales price for PUD, in negotiating with YTY about

7   the price increase, and in ultimately deciding to terminate the agreement when the

8   impasse could not be resolved, were all steps specifically sanctioned by the provision in

9   the Sales Agreement covering the topic.  Nowhere has YTY put forward any evidence

10  demonstrating a deviation from or a violation of the Sales Agreement's detailed provisions

11  relating to Dow's ability to raise the price of PUD.

12       Accordingly, the Court hereby **DISMISSES** YTY's breach of contract claim insofar

13  as that claim is predicated upon a breach of the parties' Sales Agreement.

14       Insofar as the breaches related to the Asset Acquisition Agreement (Dow's failure to

15  disclose information about the glove business' profitability and the financial worthiness of

16  Dow's largest glove customer during the contract negotiations themselves), YTY's contract

17  claim suffers in several respects.

18       To prevail on a contract claim, the plaintiff must establish that defendant's breach

19  caused plaintiff's injury.  See Hendricks v. DSW Shoe Warehouse, Inc., 444 F.Supp.2d

20  775, 780 (W.D. Mich. 2006) (observing that to state a breach of contract claim a party

21  must prove "the breach caused the plaintiff's injury" (citing In re Brown, 342 F.3d 620, 628

22  (6th Cir. 2003))).  Thus, it has been held that contract damages under Michigan law are

23  limited to those which "arise naturally from the breach" and that dismissal of a contract

24  claim is warranted where the damages in question are "dependent upon the chances of

25  business or other contingencies [.]"  Hendricks, 444 F.Supp.2d at 780.  These points of law

26  undermine YTY's claim for damages with respect to the asserted breaches of the Asset

27  Acquisition Agreement.  Here, YTY cannot prove it suffered any injury from Dow's failure to

28  inform it of Maxxim Medical's precarious financial worthiness.

1    To begin, a month <u>before</u> YTY closed the transaction with Dow, YTY was informed

2    by its glove broker in the United States that Maxxim Medical was contemplating

3    bankruptcy (or, in the language of the email, "filing for restructuring" that would include its

4    "glove div"), a disclosure that was greeted not as a red flag as to the soundness of

5    proceeding with the purchase of Dow's PU glove business (for whom Maxxim Medical was

6    the largest customer), but as an opportunity for YTY to possibly purchase Maxxim

7    Medical's glove division outright.  This advance knowledge breaks any link between the

8    harm YTY suffered from Maxxim Medical's subsequent filing for bankruptcy and Dow's

9    failure to inform it of the customer's financial problems ahead of time.  Any loss YTY

10   suffered in regards to Maxxim Medical's financial difficulties were not a direct or proximate

11   result of Dow's breach, but of YTY's own failure to do further inquiry when alerted to the

12   fact <u>before</u> consummation of the sale of the glove business with Dow.

13   Finally, from the evidence submitted, YTY's own board members stated that sales

14   to Maxxim Medical several months after YTY's purchase of Dow's business were in line

15   with YTY's expectations, thereby undercutting to a large extent the effect Maxxim

16   Medical's bankruptcy had on the profitability of YTY newly-acquired PU glove business.

17   The dip in sales to Maxxim Medical in late 2003 was attributable to the company being

18   acquired by Medline and rebounded quickly thereafter.  In this respect, any loss of sales

19   was more "dependent upon the chances of business or other contingencies" than it was on

20   Dow's failure to inform YTY about Maxxim Medical's financial worthiness.

21   Similarly, there was no provision in the Asset Acquisition Agreement requiring that

22   Dow supply YTY with the financial worthiness of the PU glove business.  In the absence of

23   a contractual provision to do so, Dow could not have breached its obligations under the

24   agreement, nor any implied covenant of good faith or fair dealing (the latter being limited to

25   a party's execution of its express obligations under the contract).  The good faith provision

26   in the Asset Acquisition Agreement similarly did not oblige Dow to provide such

27   information.  Instead, that provision simply called for Dow to "do such acts and things and

28   execute such deeds and documents as may be necessary to fully and effectively vest in

1    YTY the Assets and to assure to YTY the rights hereby agreed to be granted"  --- the

2    Assets mentioned being the customer lists (not financial data regarding the same), Dow's

3    existing inventory of PU gloves, and transfer of Dow's INTACTA trademark.  YTY has

4    proffered no arguments or evidence in response to these points concerning its breach of

5    contract claim related to the Asset Acquisition Agreement.

6          Accordingly, the Court hereby **DISMISSES** YTY's breach of contract claim insofar

7    as it related to Dow's asserted breaches of the Asset Acquisition Agreement.

8    B.    Tort Claims

9          YTY's fraud and misrepresentation tort claims all turn on whether Dow

10    misrepresented and/or concealed certain information from YTY during the January, 2003,

11    meeting of principles in Asia that led to the parties' entering into contract negotiations over

12    the sale of Dow's PU glove business.

13          1.  Choice of Law Issue

14          Unlike the contract claims, the parties dispute whether California or Michigan law

15    applies to the tort claims.  What is not in dispute is that the forum state's (that is,

16    California's) choice of law rules apply to decide the question.  See Downing v.

17    Abercrombie & Fitch, 265 F.3d 994, 1005 (9th Cir. 2001).

18          Generally, courts in California will apply California law unless the party seeking to

19    invoke a foreign state's laws can show that the foreign law differs materially from California

20    law, the difference creates a true conflict between the respective state's interests, and the

21    foreign state has a greater interest in having its laws applied.  See McCann v. Foster

22    Wheeler, 160 Cal.App.4th 689, 695 (2008).  In this regard, YTY concedes that, "to a great

23    extent," the laws of California and Michigan with respect to the remaining tort claims at

24    issue do "not materially conflict," thereby "obviating any choice-of-law issue."  (Opp. at 13).

25    Without any material conflict, California's choice of law rules clearly dictate that California

26    law applies.   Accordingly, the Court will apply California law to YTY's fraud-based and

27    negligent misrepresentation claims.

28

1    The one specific claim where YTY does draw the Court's attention to a material

2    conflict is with respect to its innocent misrepresentation claim; the material difference being

3    that such a claim is recognized under Michigan law but not under California law.  Compare

4    City of Atascadero v.Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal.App.4th 445, 482

5    (1998), with Forge v. Smith, 580 N.W.2d 876 (Mich. 1998).  The problem for YTY is that

6    the only reason proffered by YTY for why Michigan law should apply is that this is where

7    Dow is headquartered.  Other than that point, no other reason is given why the Court

8    should not follow the general rule which is that the law of the forum state governs tort

9    claims filed in that forum.  Indeed, in establishing that venue was proper in this forum, YTY

10   went to great lengths establishing its ties to California.  Given that the injured party has

11   strong connections to the forum state, the Court cannot say that the simple fact that Dow is

12   headquartered in Michigan is sufficient to warrant applying Michigan law to this one claim

13   unlike all the other tort claims.  Thus, the Court will apply California law to YTY's innocent

14   misrepresentation claim and, accordingly, **DISMISSES** that claim as such a cause of

15   action does not exist under California law.

16          2.   Fraud and Misrepresentation Claims

17          Turning to the tort claims themselves, it is well-settled that a claim for fraud requires

18   proof of a misrepresentation, knowledge of the representation's falsity, intent to defraud,

19   justifiable reliance by the party to whom the fraud is made, and damages.  See Glen Holly

20   Entertainment, Inc. v. Tektronix, 100 F.Supp.2d 1086, 1093 (C.D. Cal. 1999).  Negligent

21   misrepresentation requires proof the same elements except for the intent to defraud.  See

22   Cicone v. URS Corp., 183 Cal.App.3d 194, 208 (1986) ("Where a defendant makes false

23   statements, honestly believing them to be true, but without reasonable grounds for such

24   belief, he may be held liable for negligent misrepresentation, a form of deceit").

25          Dow argues that the statements made by Mr. James during the meeting in Kuala

26   Lumpar, Malaysia, fail to fit within any of the elements necessary to prove any of these tort

27   causes of action because there was no justifiable basis to rely on his statements.

28   Specifically, Dow argues that, as to the fraud-based claims (the ones for fraud and

1  fraudulent concealment/non-disclosure), many of Mr. James' statements were mere

2  puffery (meaning Mr. James did not make a specific factual assertion, but instead made an

3  overly generalized exaggerated claim) , opinion, or a statement of future conditions, and

4  thus not actionable.  In particular, Mr. James' statements that the PU glove business was

5  "growing," "highly successful," had "grown significantly," was "doing well," and was a

6  "tremendous business opportunity for YTY" were nothing more (according to Dow) than the

7  usual spin businesses make any time they try to get someone to buy a product (or, in this

8  case, a business), and was not the imparting of a specific factual condition about Dow's

9  glove business, as would be the case if Mr. James had said sales growth had increased by

10  x%.  YTY disagrees, arguing that Mr. James' statements regarding the Dalton plant, the

11  less expensive nature of the G2G PUD,  the data on the financial performance to date of

12  Dow's PU glove business, and the permanent costs savings on the price of PUD that

13  would be achieved from all of the above, all were "primarily specific, present-tense factual

14  assertions and descriptions of then-existing things exclusively within Dow's knowledge."

15  (Opp. at 14).

16       This debate between the parties is important because, under California law, the

17  alleged fraudulent statement must be "an affirmation of [a specific] past or existing fact" to

18  be actionable; "predictions as to future events" are considered opinions and are not

19  actionable in fraud.  Glen Holly, 100 F.Supp.2d at 1093.  The "misrepresentation must also

20  ordinarily be a specific factual assertion; generalized statements are usually not actionable

21  as fraud."  Id.  Thus, "statements about specific or absolute characteristics of a product are

22  considered specific statements and may be actionable statements of fraud."  Id.  As one

23  California court framed the question:

24          [T]he representation must ordinarily be an affirmation of fact.   .
             . . "Wherever a party states a matter which might otherwise be
25          only an opinion, and does not state it as the mere expression of
             his own opinion, but affirms it as an existing fact material to the
26          transaction, so that the other party may reasonably treat it as a
             fact and rely and act upon it as such, then the statement clearly
27          becomes an affirmation of fact within the meaning of the
             general rule, and may be a fraudulent misrepresentation."
28          Predictions or representations as to what will happen in the

1
2
3

> future are normally treated as opinion; but often they may be
> interpreted as implying knowledge of facts which makes the
> predictions probable.  If the defendant does not know of such
> facts, the statement is an actionable misrepresentation.

4  Cicone v. URS Corp., 183 Cal.App.3d 194, 202-03 (1986).  It is in applying this amorphous

5  legal principle to concrete facts where the problem in drawing a line between actionable

6  and non-actionable fraud arises.

7        Although the Court agrees that much of what was said by Mr. James during his

8  presentation in Kuala Lumpar, Malaysia,  was not much more than the standard hyperbole

9  for which no action in fraud would lie, see Glen Holly, 100 F.Supp.2d at 1096 (dismissing

10  statements that something was a "high priority," development of a product would be

11  pursued "full tilt," or that one's product was made of technology "superior" to a rival's were

12  all dismissed as "puffery" for which no action in fraud would lie), several of his statements

13  crossed the line from simple boasts to an actual representation of existing facts or

14  intentions by Dow.  With respect to the statements that Dow was intending to move its

15  production of PUD to the Dalton, Georgia, plant within six to nine months, the specificity

16  and the expression of Dow's present intentions raise the statement from a vague

17  prognostication of future events to a more concrete expression of present existing facts;

18  that is, Dow presently intended to move its PUD production to the Dalton plant.  A

19  misrepresentation of one's present intentions is fraud.  As the court in Glen Holly

20  observed, a defendant's statement that it would pursue production of a product "full tilt"

21  would have crossed the line into fraud had defendant "falsely claim[ed] to be working on

22  specific product developments." 100 F.Supp.2d at 1096 n.2.  Here, Mr. James tied

23  together those specifics by pointing to a particular act Dow presently intended to perform,

24  the move of production to the Dalton plant.  The reason for why such an expression of

25  one's present intent is actionable in fraud rather than dismissed as simple hyperbole was

26  explained by one California court as follows:

27
28

> A statement of what the defendant or some third party intends
> to do relates to an existing state of mind, and is a
> representation of fact.  Thus, a promise made without any

> intention to perform it may constitute fraud. In other words, a promise to do something necessarily implies the intention to perform, and where such intention is absent, there is a misrepresentation of fact, which is actionable fraud.

Cicone, 183 Cal.App.3d at 203 (finding that it was actionable fraud "where a corporation agent [falsely] represents the corporation will lease certain property or locate a plant in a certain city"). It is in this respect that Mr. James' related statement regarding what Dow intended to do with the Dalton plant or its intentions to create a second generation material (at the Dalton plant no less) using less expensive technology also slips out from under the rubric of puffery or opinion of future events and into the realm of actionable fraud. See Glen Holly, 100 F.Supp.2d at 1097 (finding representation from corporate representative that company "was in a position to deliver" certain next generation software by a said future date was actionable as fraud).

Moreover, there is a genuine issue of dispute whether Mr. James further informed the YTY directors at the meeting that "the permanent cost savings to YTY would be at least 20 cents per kilogram (wet)." This representation, if in fact made, clearly goes beyond the mere vague, overly generalized, and unverifiable statements Mr. James otherwise is alleged to have made, to a more concrete and specific one to which the concepts of puffery and opinion do not apply. Accordingly, the Court finds that, at least with respect to this particular statement concerning cost savings (again to which there exists a material fact in dispute), and to the ones concerning Dow's specific intent for future activities (namely, the moving of production to the Dalton plant and the creation of the next generation of PUD product at that plant utilizing certain less expensive technology), such statements are actionable fraud.

Dow next argues that YTY's failure to conduct a due diligence in verifying any of these representations renders its reliance on Mr. James' statements unreasonable and therefore precludes liability from attaching. This is especially the case, Dow argues, where YTY is a sophisticated business and was represented by counsel during the contract negotiations themselves. Dow cites a Second Circuit opinion and a district court opinion

1  from the Southern District of New York to support its position.  See Grumman Allied Indus.,

2  Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2nd Cir. 1984) ("Where sophisticated

3  businessmen engaged in major transactions enjoy access to critical information but fail to

4  take advantage of that access, [] courts are particularly disinclined to entertain claims of

5  justifiable reliance"); In re AHT Corp., 292 B.R. 734, 743-45 (S.D.N.Y. 2003).

6       That said, "[w]hether reliance is justified is a question of fact for the determination of

7  the trier of fact." Cicone, 183 Cal.App.3d at 205.  Admittedly, "whether the person who

8  claims reliance was justified in relying on the representation" is measured "in light of his

9  own knowledge and experience." Id.  "Negligence in reliance upon a misrepresentation is

10  not a defense where the misrepresentation was intentionally made to induce reliance upon

11  it.  Only if the conduct of the plaintiff in relying upon a misrepresentation in light of his own

12  intelligence and information was manifestly unreasonable will he be denied recover." Id.

13       The problem with Dow's argument is that it is directed more towards YTY's claims

14  concerning Mr. James' statements about the PU glove businesses' profitability and

15  success --- issues that would be more readily discoverable as fraudulent with some

16  inspection into Dow's financial records and books --- than the remaining statements at

17  issue here.  The remaining statements go to issues that cannot be so easily ferreted out;

18  they concern Dow's fraudulent description of its own presently existing intentions.  Such

19  representations, more than those of other facts concerning historical or present money and

20  numbers, are less susceptible to invalidation.  In this respect, the cases cited to by Dow

21  are inapposite.  See Atari Corp. v. Ernst & Whinney, 981 F.2d 1025, 1031 (9th Cir. 1992)

22  (finding reliance unjustifiable when representations in questions "were obviously false";

23  "Atari possessed facts demonstrating that the representations upon which it claims to have

24  relied were 'patently and obviously false'").  Indeed, in some respects, the substance of the

25  representations made by Dow concerned its own unique expert opinion regarding the

26  manufacturing (and the components and other materials that go therein) into the

27  production and into the unique patented chemical process used in making the PUD raw

28  material, not of the PU gloves themselves (something which YTY shared similar

1    knowledge).  As one of the cases cited to by Dow remarked, reliance on another's

2    representations are reasonable when either the party making the representation is viewed

3    as "an expert" on the topic in question or the representations "are especially hard to

4    check."  General American Life Ins. Co. v. Castonguay, 984 F.2d 1518, 1520-21 (9th Cir.

5    1993) (construing fraud claim under California law).  Both qualifiers could be seen as

6    applying in this case.

7         Even more problematic for Dow is the fact that Mr. James (allegedly) specifically

8    warned the YTY board that, should it wish to conduct a due diligence into purchasing the

9    PU glove business, such an act would lead to an increase in the business' purchase price

10   and could jeopardize the sale of the business to a third party.  In that context, it may well

11   be viewed that deciding not to conduct a due diligence was reasonable or at least not

12   negligent as it preserved YTY's ability to buy the PU glove business at a lower price

13   without competing bids from others.  Of course, by the same token, Mr. James' alleged

14   warning could be viewed as only exacerbating the negligence in YTY's going forward with

15   the deal without conducting such due diligence; Dow's warning not to look at its financials

16   could be seen as a red flag that there was a problem with the company's financials insofar

17   as the PU glove business was concerned.  The point is that YTY's failure to conduct due

18   diligence does not necessarily foreclose Dow's potential liability.  "Whether the buyer

19   unreasonably failed to protect himself and unjustifiably failed to discover true conditions

20   depends upon all the circumstances.  This presents an issue of fact for the trier of fact."

21   Furla v. Jon Douglas Co., 65 Cal.App.4th 1069, 1079 (1998).  In the end, the Court finds

22   that the justifiable nature of relying on Dow's representations of its own present intent

23   absent an attempt to ferret out the same by due diligence has too many factual

24   permutations to warrant awarding summary adjudication in Dow's favor; rather, this matter

25   must be resolved by the trier of fact in this case, the jury.

26        Finally, Dow argues that any reliance YTY put on the representations made by Mr.

27   James was unreasonable due to the fact that the contracts themselves have a merger

28   clause, rendering any oral representations made during the lead up to the execution of the

1    contracts null.   Dow in essence asserts that integration clauses in contracts operate as a

2    barrier to any fraud or misrepresentation claim by foreclosing the possibility of the plaintiff

3    establishing the justifiable reliance element needed for such a claim.  Such an argument is

4    a misstatement of California law.  One of the cases cited to by Dow makes this very

5    proposition patently clear:  "As the court in <u>Greenspan</u> held, a <u>per se</u> rule that an

6    integration/no oral representations clause establishes, as a matter of law, that a party

7    claiming fraud did not reasonably rely on representations not contained in the contract is

8    inconsistent with California law."  <u>Hinesley v. Oakshade Town Center</u>, 135 Cal.App.4th

9    289, 301 (2005).  As the court in <u>Hinesley</u> noted, an integration clause may weigh against

10   justifiable reliance when the clause in question is narrowly tailored to gauge against the

11   particular misrepresentations at issue in the case; broad, all-encompassing language will

12   not do.  <u>Id</u>. at 302 (distinguishing between house defect cases containing an "as is" clause

13   from a contract containing "merely a generic integration/no oral representations clause";

14   the presence of the former tends to undermine any justifiable reliance on oral

15   representations touching upon the subject matter of the clause, while the latter does not

16   tend to perform the same function).  The agreements drafted by Dow all contain blanket

17   boilerplate integration clauses, none directed to representations concerning any specific

18   topics or subject matter, let along the ones at issue in this case.  <u>See</u> (First Am. Compl.,

19   Ex. A ¶ 15.1 ("This Agreement . . . shall constitute the entire agreement and understanding

20   between the parties with respect to all matters which are referred to")) .  In the absence of

21   a specifically tailored integration clause, the existence of these broad provisions in the

22   parties' agreements do not, ipso facto, translate into an award of judgment in Dow's favor;

23   the clause is simply one of many facts for the trier of facts to consider in deciding whether

24   YTY's reliance on Mr. James' representations was justified.

25        Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Dow's motion for

26   summary judgment as to YTY's fraud and negligent misrepresentation claims.

27        3.  <u>Fraudulent Concealment/Non-Disclosure</u>

28

1        YTY's claim for fraudulent concealment (predicated upon Dow's failure to inform

2    YTY about Maxxim Medical's financial health) is undermined by the fact that there was no

3    relationship of trust and confidence between the parties during the time of the contract

4    negotiations as to give rise to a duty to disclose such information.[5]  As the Court found in

5    its prior order on the motion to dismiss, the parties were independent, for-profit,

6    commercial entities, engaged in an arms-length transaction over the purchase of a multi-

7    million dollar business.  Moreover, the provision in the parties' Asset Acquisition

8    Agreement imposing a contractual duty on Dow to disclose accurate and complete details

9    of Dow's customers cannot give rise to an independent tort duty to do the same.  See Stop

10   Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group, 143 Cal.App.4th 1036, 1041

11   (2006).  Even more problematic for YTY's claim on this front is the fact that they knew

12   ahead of time of Maxxim Medical's financial difficulties.  Advance knowledge undermines

13   any argument that the information was concealed.  See Volk v. D.A. Davidson & Co., 816

14   F.2d 1406, 1416 (9th Cir. 1987).  YTY seeks to downplay this prior knowledge by saying

15   that all it knew was Maxxim Medical was "restructuring" its business, which was no

16   indication that its glove business was in poor financial straits.  Even if this were so, receipt

17   of the information that the largest customer of PU gloves was undergoing a "restructuring"

18   (however it was understood by YTY) should have sent up red flags (or at least yellow

19   flags) for YTY to look into the financial worthiness of the company.  Instead, YTY did

20   nothing.  This undermines any finding of justifiable reliance.  In conclusion, for many of the

21   same reasons YTY's contractual claims regarding Maxxim Medical falter, so too does its

22   fraudulent concealment tort claim.

23        Accordingly, the Court hereby **DISMISSES** YTY's fraudulent concealment/non-

24   disclosure claim.

25

26        [5] To the extent YTY's fraudulent concealment claim is predicated upon Dow's failure
27   to disclose facts concerning the financial condition of the PU glove business that claim is
     without merit for the same reasons the Court gave for dismissal of those aspects of the
28   fraud and misrepresentation claims predicated upon such non-disclosure, namely, that
     such information was puffery or opinion upon which reliance would be unjustified.

1        4.  Promissory Estoppel

2        This leaves YTY's claim for promissory estoppel based on Dow's failure to supply

3   the PUD raw material in a fashion to meet YTY's needs, failure to develop a second

4   generation of the PUD material, and failure to move production of the material to Dow's

5   plant in Dalton.  The claim fails, however, because the parties entered into a binding

6   written agreement afterwards that did not contain these promises to which YTY now seeks

7   to estop Dow from denying or meeting.  See Philips Medical Capital v. Medical Insights

8   Diagnostics Centers, Inc., 471 F.Supp.2d 1035, 1043 (N.D. Cal. 2007).  YTY cites no case

9   for the contrary proposition except that one that allows such claims where the written

10  contract term is itself subject to change, something which is not the case here.

11       Accordingly, the Court **DISMISSES** YTY's promissory estoppel claim.

12       5.  Lost Profits and the Rescission Claim

13       An argument has been advanced by Dow that, insofar as YTY is seeking as lost

14  profits as damages for any of its tort claims, such relief is barred under California law.

15  Dow is correct, but only up to a point.  California law makes clear that generally a plaintiff

16  may not recover "benefit of the bargain" damages in tort; instead, relief is limited to that

17  which would restore plaintiff to the position he or she was in before the tort was committed.

18  See Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 1240-41 (1995); Daly v. Viacom,

19  Inc., 238 F.Supp.2d 1118, 1126 (N.D. Cal. 2002) ("Under California law, in the absence of

20  a fiduciary relationship, a plaintiff can only recover 'out-of-pocket damages [which] are

21  directed to restoring the plaintiff to the financial position enjoyed by him prior to the

22  fraudulent transaction'").  That said, an exception exists under California statutory law

23  allowing lost profits in tort for the commission of "fraud" to induce the "purchase or

24  otherwise [acquisition of] property."  Cal. Civ. Code § 3343(a)(4).  Section 3343 has been

25  applied in cases involving the sale or acquisition of one business by another, see Croeni v.

26  Goldstein, 21 Cal.App.4th 754 (1994), a circumstance consonant with what happened in

27  this case (especially given that YTY is not seek return of the sales prices paid for

28  acquisition of the PU glove business and is seeking a recision of the contract giving rise to

the sale of the business).  That said, YTY's alternative claim for rescission based on these allegedly fraudulent misrepresentations is seeking the "restitution" of money exchanged in purchasing the PU glove business.  Such restitution would provide YTY with a double recovery were the Court to also allow YTY's claim for "lost profits" based on the same fraud and misrepresentations to proceed.  See id at 759-60 ("since appellants sought to enforce the sale and obtain the sale price to which they agreed, they cannot recover from Alford and Kane profits they would have earned had they kept the business, since this would amount to a double recovery.  In other words, the amount of profit earned by the business is one of the factors taken into account in establishing its value, and reflected in the sale price.  If appellants were seeking rescission against Alford and Kane, lost profits would be recoverable from them").

Accordingly, at this juncture an election must be made by YTY as to which form of damages it wishes to seek, both cannot be allowed as to do so would result in a double recovery.  Accordingly, the Court hereby affords YTY the right to elect between its request for lost profits or for rescission/restitution by formally advising the Court and Dow which they seek to pursue within fourteen (14) days of the date of this Order.

Thus, Dow's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** in the manner set forth in the body of this Order.

Dated: August 29, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

28