1
2
3
4
5
6
7
8

JS - 6

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

12

13  YTY INDUSTRY SDN. BHD., a          )   CASE NO. CV 05-8881 SGL (AJWX)
    Malaysian Corporation,             )
14                                      )   Hon. Stephen G. Larson
                Plaintiff,             )
15                                      )   FINDINGS OF FACT AND
          vs.                          )   CONCLUSIONS OF LAW BY
16                                      )   DEFENDANT THE DOW
    THE DOW CHEMICAL                    )   CHEMICAL COMPANY
17  COMPANY, a Delaware Corporation,   )
    and DOES 1-50, inclusive,          )
18                                      )
                Defendants.            )
19                                      )
                                        )
20                                      )
                                        )
21  _____)

22
23
24
25
26
27
28

# FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Having conducted a bench trial on the remaining issues in this matter, and having carefully considered all of the testimony, documentary evidence, and stipulations presented, the Court finds in favor of defendant, The Dow Chemical Company ("Dow"), and against plaintiff, YTY Industrtry SDN. BHD ("YTY"), because YTY failed to carry its burden of proof to establish that it is entitled to recision on any of the four groups of claims presented at trial, including fraudulent misrepresentation/fraudulent concealment; negligent misrepresentation/innocent misrepresentation; unilateral/mutual mistake; or failure of consideration.

In March, 2003, Dow and YTY entered into a series of agreements under which Dow sold its polyurethane glove ("PU glove") business to YTY and agreed to provide exclusively to YTY its polyurethane dispersion ("PUD") that would be used in the manufacture of PU gloves by YTY.  As the Court has previously observed, the agreements were poorly crafted, apparently in haste, and not well thought through by either party; however, in its final analysis, the Court is unable to discern sufficient evidence of fraud, misrepresentation, mistake, or failure of consideration such that recession of the contract, let alone punitive damages, is warranted.

Specifically, YTY failed to present sufficiently credible evidence that any of the statements attributed to Dow during the negotiation of the agreements that formed the basis for the contract – particularly those statement concerning the price for PUD agreed to by the parties in the contract ($1.33/wt. kg), or the representations that Dow planned to develop a second generation PUD to be used for, inter alia, PU gloves ("G2G") and would, within six to nine months, move PUD production to a larger manufacturing plant at Dalton, Georgia, and thus

---

[1]/  The Court determines and finds the following facts in this action, all established by the greater weight of the credible evidence.  If any finding of fact is determined to be a conclusion of law, or vice versa, it is hereby adopted as such.

1   reduce the cost of manufacturing PUD – were untrue, or recklessly or negligently

2   or mistakenly made, at the time they were made.

3       The Court is convinced, largely by the credible testimony of former Dow

4   employee Mr. MacDonald, that the $1.33 per pound price was a reasonable *initial*

5   or *introductory* price based on the experience and expertise of Dow's PU glove

6   team – no doubt, as the evidence reveals, designed to provide an incentive for YTY

7   to pursue the contract and one that would also be unsustainable over the longer

8   term without a very successful sales effort by YTY of the PU gloves.  The

9   corporate documents introduced at trial memorializing Dow's internal discussions,

10  when taken together (and not just selectively quoted), paint a fairly clear picture

11  that Dow both hoped, and in good faith anticipated, that this would be a successful

12  venture, with YTY generating sufficient sales of PU gloves and thus ordering

13  sufficient volumes of PUD to render this transaction a "win-win" for both Dow and

14  YTY (providing, inter alia, a economically feasible basis to produce PUD at

15  Dalton).

16      That Dow could not or would not commit to perpetually providing PUD at

17  the $1.33 price (absent certain future variables) should have been readily self-

18  evident to YTY based on the fact that *nowhere* in the contract is there any

19  provision locking in that or any other price; to the contrary, the contract expressly

20  provides terms and conditions by which Dow could increase the price of the PUD,

21  terms and conditions which appear to have been followed to the letter when the

22  price increases were subsequently announced.

23      The price for PUD quoted in the contract may well not have assured Dow of

24  a profit – the post hoc analysis by Dow's expert, Mr. Bergin (which placed the

25  March, 2003, "direct cost" of producing PUD at $1.44/wt kg, $0.11/wt kg more

26  than Dow initially priced the PUD in the contract, and which did not include

27  various other costs), as well as the 2004 analysis of Dow employee Ms. Ekeland,

28  convinces the Court of that proposition.  Most damning in this regard is Exhibit 38,

-2-

a November 18, 2004, internal Dow email communication stating that the base contract price (referred to as $1.34/wt kg) "comes from Dalton, however this did not reflect the true costs at Dalton" because it was based on high volume expectations and a "wrong assessment of costs."  The recalculation suggested that the price needed to be raised to $2.04/wt kg  in order to "just cover[] our costs." However, whether or not the *initial* price set in the contract was sustainable or cost-effective as a *fixed* price for PUD is <u>not</u> the issue in this case -- there is no credible evidence at all that, at anytime before or during the contract negotiations, Dow represented, expressly or impliedly, that $1.33/wt kg (or any other price) would be the fixed price for PUD, let alone that, with the move to Dalton, $1.13/wt kg (the contract price less the $0.20/wt kg "savings") would ever be a price, fixed or otherwsie, for PUD.

The evidence, taken as a whole, reveals that Dow could not, would not, and did not commit to providing PUD at that price for <u>any</u> fixed period of time.  The record is devoid of any credible evidence establishing for how long Mr. James or anyone else from Dow suggested – or for how long anyone at YTY could reasonably infer – that Dow would provide PUD at that price (a point that was clearly not lost on YTY's attorney, Ms. Wang).

The Court has reviewed all of the various documents purporting to establish the true cost of PUD production; when coupled with the testimony on this matter, the Court cannot find that the $1.33/wt kg price was an unreasonable <u>starting</u> price. Although YTY is no doubt correct, as Dow itself admits in Exhibit 38 and elsewhere, that, <u>in hindsight</u>, the price did not reflect all of the costs associated with production and delivery of the PUD to YTY <u>at the volume YTY was initially purchasing the PUD</u>, there is nothing wrong, as a matter of law or good business practice, to set a lower initial price in order to afford YTY an opportunity to establish their sales and increase their volume purchases, which the Court finds is precisely what Dow (and YTY, for its part) was anticipating.

-3-

1    If Dow had actually made misrepresentations concerning this price – for

2    example, stating that the price in the contract would be fixed or "permanent" or that

3    it would remain stable regardless of volume ordered, etc. – then YTY's arguments

4    would carry the day; however, no credible evidence of such misrepresentations

5    surfaced in the trial.  Although it is regrettable and perhaps even understandable (in

6    light of the close personal relationships between certain of the parties as described

7    at trial) that the YTY directors did not conduct further due diligence, it is certainly

8    not reasonable, from a business perspective, for them not to have done so.  They

9    assumed and bet on a very risky proposition by entering this contract, but there is

10   no sufficient legal reason to afford them retrospective relief for having done so.

11   As for the other alleged misrepresentations/mistakes, the Court does find that

12   Mr. James, the primary Dow representative, did indeed indicate at the January,

13   2003, meeting that Dow intended to convert to G2G and move production of PUD

14   to the Dalton plant, together which would result in a $0.20/wt kg price reduction on

15   PUD at some point in time in the future and based on some unspecified volume

16   (the reported but  unspecified "significant cost advantages" and "cost savings"); the

17   Court does not find credible evidence of any further communications between the

18   parties on this point.  Moreover, the Court further finds that, based on the evidence

19   adduced at trial, these representations were reasonably believed by Dow to be true

20   when they were made.  Just as significantly, the Court also finds that these

21   statements were not materially significant to YTY when they entered the contract.

22   First, the evidence clearly establishes – again, at the time of the contract –

23   that Dow fully intended to proceed with the production of G2G and move to the

24   Dalton plant in the future to accommodate what they anticipated to be significant

25   orders of PUD from YTY (projections which, after the first year, fell flat, through

26   no apparent fault by Dow).  Regarding the shift to Dalton, the preponderance of the

27   evidence convinces the Court that Dow – and particularly those at Dow most

28   closely associated with this transaction at Dow – were firmly of the belief – again,

-4-

1    at the time they entered into the contract with YTY – that such a move would in

2    fact occur, and took appropriate steps to follow through with that intention,

3    including applying for the capital necessary to make the shift to Dalton.  Although

4    Mr. Oh, as he testified, may have assumed that all the approvals and permits had

5    been obtained and that construction at Dalton was proceeding, the Court does not

6    find evidence to credit that assumption as reasonable; indeed, neither Mr. Oh nor

7    anyone else at YTY even asked a single question to confirm these unwarranted

8    assumptions.

9        Second, although there is no doubt that YTY would understandably view

10   positively the move to a bigger plant and a further price reduction (relative to what

11   never being established), the complete absence of any reference to either

12   component in any of the agreements or other contemporaneous documents (or not

13   even, as Dow points out, the initial complaint in this matter) convinces this Court

14   that, notwithstanding the YTY's unconvincing testimony on this point, these

15   elements were not material to YTY entering into this greement

16       In hindsight, it is clear that a number of factors, the most significant of which

17   were completely outside the control either Dow or YTY, doomed the potential

18   success of this contract.  Such factors include the apparently unexpected rise in the

19   price of raw materials, changes in competitor glove pricing, the bankruptcy

20   proceedings involving Maxxim Medical (a development that YTY was aware of

21   before consummation of the contract with Dow and actually, but wrongly, viewed

22   as a potential opportunity to exploit), and others.  That Dow subsequently

23   recognized that it, like YTY, had made "strategic errors" and had incorrectly

24   "assessed" certain costs when it entered the contract (most of which were

25   ultimately shaped by the vicissitudes discussed above, including market changes,

26   competitive developments, and material costs) does not translate into a legally

27   sufficient "mistake" or negligent misrepresentation that was known or could have

28   been known to Dow (or YTY) at the time the parties entered into the contract.

-5-

YTY, like Dow, bore certain risks in purchasing the PU glove business from Dow, and YTY ignored the very good advice offered by their attorney (Ms. Kang) who reviewed the deal in advance of the contract being consummated, particularly in terms of pricing considerations, and recommended addressing several critical issues.  Dow was never a guarantor of this business transaction, and YTY is not now entitled to recision because the business did not succeed.  Although Mr. James may well have pressed YTY to act with haste and not conduct due diligence, YTY is a sufficiently sophisticated company, engaged as it has been for many years in a wide variety of transnational transactions and currently selling approximately 1.8 billion gloves per year, to have made and be held responsible for the apparent decision to forego such due diligence.  There is no question that YTY became knowledgeable, competent, and experienced in the manufacture of PU gloves using Dow's PUD technology during the period of time prior to the contract at issue when YTY served as Dow's contract manufacturer, a successful venture during which YTY produced in excess of 200 million PU gloves for Dow.

In support of its decision, the Court also makes the further following findings of fact and conclusions of law:

# I. THE INITIAL RELATIONSHIP BETWEEN YTY AND DOW:  THE CONTRACT MANUFACTURING AGREEMENT

### A.    The Parties

1.    YTY has been engaged in the business of manufacturing disposable gloves since 1988.  (Exh. 304)  YTY is based in Malaysia, which is the world's number one supplier of medical examination gloves.  (Tr.[2] 138:20-23) YTY is among the larger glove manufacturers in Malaysia.  (Tr. 138:24-139:2; Exh. 304)  During the bulk of the transactions at issue in this litigation, 47.5 percent of YTY was owned by 3i PLC, one of the largest venture capital firms in

---

2/  "Tr." refers to the transcript of proceedings in this action.

1   the United Kingdom.  (Tr. 139:10-19; 593:1-4)  YTY is a sophisticated company,

2   with a current output of approximately 1.8 billion medical examination gloves

3   annually.  (Tr. 84:15-18)  From 2001 to 2005, YTY produced a diverse range of

4   disposable examination gloves, including latex-based and synthetic medical

5   examination gloves.  (Tr. 139:20-140:7)

6         2.    Dow is a leading science and technology company that provides

7   chemical, plastic, and agricultural products to a variety of markets.  (Ex. 304)

8         **B.    Dow's Polyurethane Dispersion and Polyurethane Gloves**

9         3.    Dow developed polyurethane dispersion ("PUD") technology

10  that allows polyurethanes to be used in an aqueous delivery system.  (Exh. 304)

11  Among its various uses, Dow's PUD process could be used in the manufacture of

12  disposable, synthetic polyurethane gloves ("PU gloves").  PUD is an oil-based

13  product, a fact that YTY knew in early 2003.  (Exhs. 233; 341; Tr. 193:18-24;

14  194:3-195:7)

15        4.    When introduced in 2001, PU gloves were unique in the

16  disposable glove industry in that they eliminated the exposure of glove users to

17  allergens transmitted from proteins and chemical accelerators commonly found in

18  natural rubber latex and some synthetic rubber gloves.  (Tr. 853:3-11)  In addition

19  to addressing latex allergy issues, PU gloves provided superior tactile sensitivity,

20  comfort, barrier protection, strength, and durability.  (Tr. 853:3-19)

21        **C.    The Contract Manufacturing Agreement: 2001-2003**

22        5.    In January 2001, Dow and YTY entered into a Contract

23  Manufacturing Agreement (Exh. 15), whereby Dow would produce the PUD and

24  ship it to YTY[3], and YTY would manufacture the PU gloves on behalf of Dow

25  using Dow's proprietary technology and ship the gloves to Dow's customers.  (Tr.

26  89:17-21)  Dow's largest customer was Maxxim Medical, Inc. ("Maxxim"), a

27

28  3/  The PUD was shipped from Dow to YTY in isotainers.  Each isotainer holds
    approximately 20 metric tons (44,080 pounds) of PUD.

-7-

1  major distributor of surgical and medical examination gloves in the United States.

2  (Tr. 173:24-174:6; Exh. 336)

3        6.     During the contract manufacturing relationship, Dow

4  manufactured its PUD at a plant in Freeport, Texas known as the Market

5  Development Plant ("MDP" or the "Freeport plant").  (Tr. 876:16-18; Exh. 304)

6  The MDP plant was a multi-purpose plant, used to develop products for new

7  businesses until they reached commercial volumes.  (Tr. 741:3-9; 880:19-881:7)

8  During the term of the Contract Manufacturing Agreement, Dow produced

9  4,839,668 pounds of PUD in 2001, and 7,436,830 pounds of PUD in 2002.  (Ex.

10  1055)

11        7.     Dow's PUD team was aware of the cost to manufacture PUD

12  during this time period.  (Tr. 890:22-891:12)  Manufacturing costs were discussed

13  often, as the manufacturing and supply chain personnel needed to be aware of the

14  costs at all times.  (Tr. 890:22-891:12)  Michael McDonald, the supply chain

15  manager for polyurethanes at the time, testified he "absolutely" had a handle on the

16  cost to manufacture PUD and "knew exactly what our costs were the whole time."

17  (Tr. 891:7-12)  Mr. McDonald's testimony was credible.

18        8.     In early 2002, Dow's cost to manufacture PUD was $1.26 per

19  dry pound (which equates to $1.28 per wet kilogram).  (Tr. 886:9-25; Exhibit 1060)

20  Dow projected that this cost would decrease to $1.10 per dry pound as Dow

21  improved capacity at the Freeport plant, and to $0.81 per dry pound upon

22  conversion by Dow from the first generation of PUD ("G1G") to G2G PUD.

23  "G2G" referred to a second generation of PUD that Dow was in the process of

24  developing.  During early 2002, Dow calculated that its cost for production of G2G

25  at a commercial production facility would be $0.70 per dry pound.  (Exhs. 1060,

26  1061; Tr. 887:5-888:22)

27        9.     Sales of the PU gloves grew significantly.  (Tr. 147:15-17)

28  Dow sold 82,150,000 PU gloves in 2001 (the first year of commercial production),

-8-

136,003,000 PU gloves in 2002, and over 49,800,000 PU gloves during the first quarter of 2003, for total sales of 267,953,000 PU gloves while Dow owned the gloves business.  (Tr. 878:22-879:11)

10.    In August 2002, YTY solicited Dow to be able to sell PU gloves for its own account in Europe.  (Tr. 89:24-90:10; 142:13-21)  These discussions were held between YTY and Stephen James[4], Dow's new business development manager in the Pacific.  (*Id.*; Tr. 679:7-14)  During the contract manufacturing period, Mr. James was the focal point for communications between Dow and YTY.  (Tr. 86:2-11)

11.    In August 2002, YTY prepared a European marketing plan, which reflected its plans for sales of PU gloves in Europe.  (Exh. 312)  This marketing plan was prepared by Wan Kuan Yoi, YTY's marketing director with over 21 years of experience in the disposable glove industry.  (Tr.77:17-22; 90:12-18; 143:2-4)  In its marketing plan, YTY set "conservative" forecasts for its sales of PU gloves in Europe of 10 million disposable medical examination gloves per month in 2003 and 15 million per month in 2004.  (Exh. 312; Tr. 91:4-14; 144:15-145:1)  YTY also forecast acquiring 5 percent of the European medical examination glove market in 2003 and 10 percent of the market in 2004.  (Exh. 312; Tr. 143:11-21)  YTY's pricing strategy for PU gloves included initially pricing the PU gloves within 5 percent points of nitrile gloves (Exh. 312; Tr. 146:7-11), and moving the pricing upwards when the gloves had gained acceptance in the marketplace.  (Exh. 312; Tr. 146:12-19)

12.    In August to September 2002, YTY also discussed with Mr. James the potential sale of PU gloves by YTY in Japan (specifically, sales by YTY of industrial grade disposable gloves to a Japanese company named Showa).  (Tr.

---

4/  As outlined below, YTY's fraud claim is based primarily on statements attributed to Mr. James.  Mr. James was not present for trial and did not testify.  Counsel for Dow explained that Mr. James presently resides in China.

1   92:17-94.2; Exhs. 309; 314)  Under this arrangement, YTY would purchase the

2   PUD from Dow and then manufacture and sell the gloves itself.  Dow quoted YTY

3   a price for PUD of $1.35 per wet kilogram.  (Tr. 94:3-9)  Mr. James told YTY this

4   was reflective of Dow's costs to manufacture PUD and deliver it to Malaysia as of

5   September 2002.  (Tr. 653:9-654:13; Exhs. 309, 314)

6           13.    YTY served as Dow's contract manufacturer from January 2001

7   to March 2003.  The contract manufacturing relationship was very profitable for

8   YTY.  (Tr. 586:21-23)  During the course of the agreement, YTY made a profit of

9   $3,826,914.67.  (Exh. 111; Tr. 587:4-9)

10  **II.    DOW'S SALE OF THE PU GLOVE BUSINESS TO YTY**

11          14.    In early 2003, Dow decided to sell the PU glove business.

12  Michael McGaugh, Dow's then new business development manager for North

13  America and Europe (Tr. 679:7-14), outlined the reasons for Dow's decision.[5]

14  First, Dow felt that a key driver for success of the PU glove business would be to

15  have it in the hands of a business familiar with the glove market, with its own

16  manufacturing plant and direct access to consumers.  (Tr. 698:1-700:3; Exh. 95)

17  Dow's business team also felt growth of the PU glove business was hampered

18  internally at Dow due to Dow's risk aversion to medical devices (Tr. 681:10-24), as

19  well as the credit limitations imposed by Dow's treasury department (Tr.

20  698:14-24).

21          15.    In January 2003, the Dow PUD team prepared an internal

22  presentation outlining its plans with respect to the sale of the PU glove business.

23  (Exh. 91)  This document states that Dow would sell PUD to the buyer of the PU

24  glove business at a price of $1.10 to $1.20 FOB per dry pound.  This equated to

25  $1.12 to $1.22 per wet kilogram.  (Exh. 91; Tr. 692:19-24)

26

27  _____

28  5/  Mr. McGaugh thought so highly of the PU glove business he personally
    considered doing a leveraged buyout of the business.  (Tr. 689:12-25.; Exh. 96)

-10-

16.     Dow solicited several glove companies to buy the PU glove business. (Tr. 695:7-17)  Mr. McGaugh contacted several glove companies based in North America, including Kimberly Clark and Ansell. (Tr. 695:7-12)  In a presentation shown to potential North American buyers, Dow quoted the price for the sale of PUD pursuant to a supply agreement as $1.10-$1.20 per dry pound. (Tr. 706:1-17; 897:17-898:10; Exh. 64)  This price was consistent with Dow's then-cost to make PUD (Tr. 898:3-10), and was considered by Dow to be a reasonable price for both Dow and the customer. (Tr. 706:22-707:2; 898:3-10)  Dow was willing to grant the buyer the exclusive right to buy PUD for use in gloves, in consideration for the sales price and commitment by the buyer to volume obligations in the outer years of a long-term sales contract. (Tr. 898:11-899:5; Exh. 64)

17.     Mr. James met with YTY representatives Messrs. Wan, Oh[6], Lim, Moh, and Yap on January 24, 2003 at the Ritz Carlton in Kuala Lumpur, Malaysia. (Tr. 96:14-18; 97:11-17; 99:14-16)  During this meeting, Mr. James told YTY that the PU glove business was for sale and explained Dow's reasons for the sale of the business as well as the anticipated shift in Dow's business model. (Tr. 97:25-98:7)  The parties did <u>not</u> discuss the price that YTY would pay for PUD at this meeting. (Tr. 101:7-9; 224:18-22; 234:17-19; 567:17-19; 582:19-23)

18.     Mr. James represented, during this January 24, 2003 meeting, that Dow intended to convert its PUD production from G1G to G2G and move production of PUD from the Freeport plant to another plant in Dalton, Georgia (the "Dalton plant") within six to nine months, and that this shift in production would result in a decrease in the price of PUD to YTY of $0.20 per wet kilogram. (Tr. 98:13-22; 218:4-13; 220:3-21; 565:21-566:3)  The Dalton plant was a larger plant than the Freeport plant. (Tr. 745:14-22)  Although the Court believes the subject of converting to G2G and shifting production to the Dalton plant was discussed at this

6/  Mr. Oh does not speak English and required a translator at trial.

1   meeting, the Court does not find credible the testimony of YTY's witnesses that
2   Mr. James made any affirmative representation that the price of PUD to YTY
3   would automatically decrease by $0.20 as soon as the shift to G2G at the Dalton
4   plant occurred.  The parties did not discuss the pricing for PUD on January 24,
5   2003, (Tr. 101:7-9; 224:18-22; 234:17-19; 567:17-19; 582:19-23), and there is no
6   basis from which to measure the $0.20 per wet kilogram "savings."  Further, the
7   only contemporaneous notes of the January 24, 2003 meeting are those of Michael
8   Yap, a YTY employee.  Mr. Yap's notes do not reflect anything about G2G, the
9   Dalton plant or a $0.20 price decrease.[7]   (Exh. 318)  The Court does not find
10  credible the testimony proffered by YTY that the reason for this deficiency is that
11  Mr. Yap was "in and out" of the meeting (Tr. 97:11-17; 217:3-9), particularly since
12  Mr. Yap's notes (Exh. 318) cover many details of the proposed transaction.

13          19.     During the January 24, 2003 meeting, Mr. James did not show
14  the YTY representatives any documents about the PU glove business.  (Tr.
15  148:9-11; 238:13-22; 656:19-21)  Similarly, neither on that date, nor at any time
16  through the closing of the acquisition on March 28, 2003, did Mr. James provide
17  any details about the size or capacity of the Dalton plant, what steps needed to be
18  taken to make the Dalton plant suitable for G2G production, the chemical
19  properties of G2G, or anything else about the Dalton plant or G2G.  (Tr.
20  149:12-25; 150:7-17; 234:6-10; 234:20-235:2; 238:23-239:7; 587:18-588:18)  Nor
21  did YTY's representatives ask any material questions about either the Dalton plant
22  or G2G.  (Tr. 148:15-24; 149:12-19; 238:23-239:7; 587:22-588:18)  Indeed, the
23  evidence indicates that YTY did little to no due diligence with respect to its
24  purchase of the PU glove business.

25
26

27  7/  Mr. Yap himself acknowledges he never heard Mr. James discuss G2G, the
    Dalton plant, or a 20 cent price decrease on January 24, 2003. (Tr. 656:5-12;
28  656:22-657:5)

-12-

20.     Following their meeting with Mr. James, YTY directors Messrs. Oh, Wan, Lim, and Moh had a private discussion about whether or not to purchase the PU glove business.  (Tr. 99:6-11; 99:20-23)  This meeting lasted somewhere from 10 to 20 minutes.  (Tr. 100:11-13; 567:6-10)  Immediately thereafter, the four YTY directors signed a written offer that Mr. James typed to buy the PU glove business from Dow for $6 million.  (Exh. 17; Tr. 152:17-20)  YTY's offer letter says nothing about the price to be paid for PUD, shifting production to the Dalton plant, conversion to G2G, or obtaining a $0.20 per wet kilogram discount on the price of PUD.  (Exh. 17; Tr. 155:4-7)

21.     On February 9, 2003, YTY learned that Maxxim, Dow's largest PU glove customer, would file for bankruptcy on February 12, 2003.  (Exh. 119)

22.     Representatives from Dow and YTY met in February 2003 to negotiate the price to be paid for the PU glove business.  (Tr. 106:12-18)  The parties agreed to a $9 million sales price for the PU glove business, including the transfer to YTY of inventory of approximately 70 million PU gloves.  (Tr. 223:17-19; 249:5-250:23)  At this meeting, the parties also discussed (for the first time) the price for PUD under the anticipated supply agreement.  (Tr. 106:24-107:1)  Dow proposed a price for PUD of $1.33 per wet kilogram.  (Tr. 155:20-25; 223:20-23)  YTY proposed a lower price, but Dow refused, and the parties negotiated until they agreed to the price of $1.33 per wet kilogram, with volume discounts.  (Tr. 155:8-157:10)

23.     During this February 2003 meeting, there was no discussion of the reduced price referenced by Mr. James upon a shift of production to the Dalton plant and conversion to G2G.  (Tr. 224:4-17; 251:6-9)  Mr. Oh testified that, following the meeting, outside the presence of all other Dow personnel, Mr. James reiterated that the price of PUD would decrease by $0.20 as soon as production shifted to the Dalton plant.  (Tr. 251:11-21)  The Court does not credit Mr. Oh's testimony.  First, Mr. Oh's statements at trial are not supported by his prior

-13-

deposition testimony, where he said nothing about any discussion with Mr. James about the $0.20 discount on the way out of the meeting, and where he testified that he could not remember specifically anything that was said about G2G or the Dalton plant at a dinner meeting with Mr. James later that evening. (Tr. 252:2-253:22) Moreover, Mr. Oh's statements are inconsistent with those of Mr. Lim and Mr. Wan, the two other YTY representatives present at this February 2003 meeting, both of whom testified that they could not recall any discussion with Mr. James about G2G, the Dalton plant or $0.20 price discount after the initial meeting on January 24, 2003. (Tr. 150:7-17; 590:15-17) This discrepancy is particularly acute in light of the fact that Mr. Oh does not speak English. (Tr. 158:21-24; 212:1-2; 599:25-600:3) All statements made by Mr. James were translated for Mr. Oh by either Mr. Lim or Mr. Wan. (Tr. 216:9-11; 236:5-6; 237:22-24)

24. The $1.33 price negotiated and agreed to by the parties in February, 2003, was consistent with Dow's cost to make PUD at the time (Tr. 900:15-901:18), a cost that Dow's employees were familiar with (Tr. 900:15-901:6; 953:9-21), and was a price that Dow was comfortable with (Tr. 898:3-10). Dow's employees working on the sales project reasonably expected that YTY initially would buy at least as much PUD as Dow had produced in 2002: 7 to 8 million wet pounds. (Tr. 909:15-910:9; Exh. 1055) Dow understood that as it produced more PUD, its unit cost to make PUD would decline, making its sales of PUD to YTY profitable over time. (Tr. 909:3-910:21)

25. Likewise, YTY projected selling increasingly larger quantities of PU gloves. Just prior to the February, 2003, negotiation meeting, YTY prepared a five-year budget for its anticipated PU glove sales. (Exhs. 232, 324) This budget ultimately was provided to YTY's lenders. (Tr. 567:25-568:9) In this budget, YTY projected that it would sell 334 million PU gloves in its fiscal year 2004 (ending March 31, 2004), 536 million PU gloves in fiscal year 2005, and 715 million PU gloves in fiscal year 2006. (Exh. 232) To produce that many PU

-14-

1  gloves, YTY would use 11.1 million, 17.8 million, and 23.8 million wet pounds of

2  PUD, respectively.  (Tr. 861:7-18)

3        26.    Both in the context of the negotiations and afterwards, the

4  parties understood the price for PUD would not be fixed during the course of the

5  supply agreement.  While the parties worked towards finalizing the contracts to

6  effectuate the sale of the PU glove business and supply of PUD, Dow proposed to

7  YTY that future PUD price increases be linked to increases in the cost to make

8  PUD.  YTY declined this proposal.  (Tr. 708:23-709:4, 710:18-711:15; Exh. 99)

9        27.    On February 20, 2003, Dow sent YTY a Letter of Intent and

10  Term Sheet, which Mr. Oh signed.  (Exh. 114)  The Term Sheet specified that the

11  supply agreement (which ultimately became the Sales Contract) would have

12  volume discounts and that "Dow shall be permitted to increase the price [of PUD]

13  by providing 45 days prior notice to YTY."  (*Id.*)  In the final Sales Contract, the

14  notice period for a price increase was extended to 90 days.  (Exh. 53)  This

15  demonstrates that YTY did negotiate and request changes to the language of at

16  least some of the provisions of the Sales Contract.  The Term Sheet says nothing

17  about shifting production of PUD to the Dalton plant, converting to G2G, or a

18  $0.20 discount on the price of PUD upon a shift of production to the Dalton plant.

19        28.    In February, 2003, YTY submitted to its bank an application for

20  a loan to help finance the purchase of the PU glove business.  (Exh. 112)  The loan

21  application says nothing about shifting production of PUD to the Dalton plant,

22  converting to G2G, or obtaining a $0.20 discount on the price of PUD upon a shift

23  in production to the Dalton plant.  (Exh. 112; Tr. 591:10-13)

24        29.    Dow provided YTY with drafts of the three contracts that would

25  effectuate the sale of the PU glove business.  (Tr. 574: 2-7; 592:2-6)  The draft

26  Sales Contract included provisions authorizing Dow to raise the price of PUD for

27  any reason upon 90 days notice, two volume discounts totaling $0.20, and an

28  integration clause.  (Exh. 115)  YTY sent a copy of the draft Sales Contract to 3i

-15-

PLC for review and comment. (*Id.*; Tr. 299:5-300:1; 592:7-24) The draft Sales Contract says nothing about shifting production of PUD to the Dalton plant, converting to G2G, or obtaining a $0.20 discount on the price of PUD upon a shift in production to the Dalton plant. (Exh. 115)

30.     At the request of 3i PLC, YTY sent the draft agreements to its lawyers, SKYeoh & Partners, for review and comment. (Tr. 160:24-161:8; 594:10-16; Exh. 19) Ms. Ailin Kang, the lawyer that reviewed the draft contracts for YTY, sent a detailed memorandum to YTY with numerous comments and suggestions on March 24, 2003. (Exh. 19) Ms. Kang noted that there were "material issues" involved with the agreements. (*Id.*) Chief among Ms. Kang's comments was that YTY should negotiate a fixed price for PUD for the term of the Sales Contract. (*Id.*) Ms. Kang also questioned whether YTY had conducted a due diligence review. (*Id.*) YTY read Ms. Kang's comments (Tr. 161:23-25; 240:15-24), but did not request any changes to the material provisions of the Sales Contract. (Tr. 162: 20-22; 597:5-20) In particular, YTY took no steps to try and negotiate a fixed price for PUD, to link increases in the price of PUD to Dow's cost increases to manufacture PUD, or otherwise incorporate Ms. Kang's comments. (Tr. 162: 7-12; 241:22-25; 595:20-23; 596:8-11)

31.     On March 17, 2003, Dow's Board of Directors adopted a resolution approving the sale of the PU glove business to YTY. (Exh. 245) The letter soliciting Board approval (Exh. 188) valued the income to be realized by Dow over the 10-year term of the Sales Contract to exceed the acquisition price of $9 million. (Tr. 715:7-25) The request for Board approval projected average annual sales during the 10-year term of the Sales Contract of 5,000 to 7,000 wet metric tons (roughly 11-15 million wet pounds). (Exh. 188) At these quantities, as of March, 2003, the price of $1.33 per wet kilogram would have been price effective for Dow. (Tr. 909:3-910:21) The letter outlined that YTY would have

-16-

exclusive rights to PUD for glove uses and that YTY had no minimum volume requirements in years 1 through 5 of the Sales Contract.  (Tr. 716:1-8; Exh. 188)

32.     On March 28, 2003, YTY's Board of Directors held a Board meeting, during which the Board unanimously voted in favor of entering into the contracts for the purchase of the PU glove business.  (Exh. 217; Tr. 160: 14-23; 601:2-4)  During this Board meeting, there was no discussion about the Dalton plant, G2G, or any alleged promise by Dow to decrease the price of PUD by $0.20.  (Tr. 601:7-12)  Representatives from 3i PLC were present at this meeting.  (Tr. 601:5-6)

33.     In connection with the purchase transaction, effective March 28, 2003, YTY and Dow executed three separate contracts:  (1) an Asset Acquisition Agreement; (2) a Technology Agreement; and (3) a Sales Contract.  (Exh. 336)

34.     The Asset Acquisition Agreement effectuated Dow's sale of the PU glove business to YTY.  Via this agreement, YTY purchased Dow's customer lists and other assets, including primarily its inventory of 70 million PU gloves and certain trademarks, for $9 million.  (Exh. 336)

35.     Pursuant to the Sales Contract (Exh. 53), YTY agreed to purchase 100 percent of its requirements of PUD from Dow, Dow agreed to sell to YTY 100 percent of YTY's requirements for PUD, and Dow could only sell PUD for gloves to YTY for at least 5 years (and up to an additional 5 years if certain volume thresholds were satisfied).  YTY had no volume commitments for the first five years of the contract.  The Sales Contract set forth an initial base price for PUD (ID 1000, also known as G1G) of $1.33 per wet kilogram delivered to Malaysia.  The Sales Contract included two volume price adjustments totaling $0.20 per kilogram.  (Exh. 53; Tr. 157:16-158:2)

36.     The Sales Contract also set forth the terms under which Dow could increase the price for PUD:

> Dow may increase prices…by giving Customer at least 90 days prior notice.  These changes will be deemed acceptable unless Customer objects in writing before the effective date.  If Customer objects, then Dow will within 45 days notify Customer whether (a) Dow will continue to sell on the previous terms or (b) Dow wishes to negotiate the changes with Customer.  During any negotiations, price and other terms will be those which Dow implemented by the notice.  If negotiations are not finalized within 45 days after the effective date of the change, then either Customer or Dow may terminate the Contract by written notice.

(Exh. 53)  In the Sales Contract, PUD is identified as being delivered to Malaysia from either Freeport, Texas or Dalton, Georgia.  The Sales Contract says nothing about shifting production of PUD to the Dalton plant, converting to G2G, or obtaining a $0.20 discount on the price of PUD upon a shift in production to the Dalton plant.

## III.  "WIN-WIN" SITUATION: MARCH 2003 THROUGH NOVEMBER 2003

### A.  YTY's Post-Sale Purchases of PUD

37.    After the sale of the PU gloves business closed, and during the balance of 2003, YTY ordered and received delivery of substantial quantities of PUD from Dow, as follows:

| | |
|---|---|
| June 2003 | 265,830 wet kilograms (586,155 wet pounds) |
| July 2003 | 558,190 wet kilograms (1,230,809 wet pounds) |
| August 2003 | 167,540 wet kilograms (369,426 wet pounds) |
| September 2003 | 414,650 wet kilograms (914,303 wet pounds) |
| October 2003 | 394,630 wet kilograms (870,159 wet pounds) |
| November 2003 | 351,970 wet kilograms (776,094 wet pounds) |
| December 2003 | 228,190 wet kilograms (503,159 wet pounds) |

(Exh. 498)  These deliveries, on an annualized basis, equated to 4,082,000 wet kilograms, or over 9 million wet pounds, of PUD.

DOW'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

38.     Maxxim remained YTY's biggest customer for PU gloves and purchased large quantities of gloves.  (Tr. 174:15-20; 606:2-5)  PU gloves were sold to Maxxim at $42 per case (each case is 1,000 PU gloves).  (Tr. 175:23-176:2; Exh. 221)  By May 2003, YTY had sold to Maxxim the entire inventory of PU gloves that it received from Dow as part of the purchase/sale transaction.  (Tr. 175:15-20; 661:12-662:2; Exh. 121)  In August 2003, YTY signed a Supply Agreement with Maxxim.  (Tr. 176: 3-5; Exh. 221)  Under the YTY-Maxxim Supply Agreement, Maxxim committed to buying 275 million pieces of PU gloves during the first year.  (Exh. 221; Tr. 176:22-177:5)

**B.     Dow's Plans to Shift Production of PUD to the Dalton Plant and Convert to G2G**

39.     As of March 2003, when the sales agreements were signed, Dow planned to shift production of PUD from the Freeport plant to the Dalton plant, where Dow intended to produce G2G.  (Tr. 910:22-911:21, 935:21-936:9; Exh. 67A)  Dow's goal with respect to G2G was to utilize it as a platform for dispersions used in other industries, such as carpet, synthetic leather, and foam.  (Tr. 879:12-880:10)

40.     During the balance of 2003, Dow proceeded with its plans to shift production to the Dalton plant and have YTY convert to G2G.  Mr. McDonald described the detailed procedures and plans Dow had in place for its shift to production of G2G at the Dalton plant.  (Tr. 917:19-918:15, 920:4-921:3, 921:16-923:2, 925:4-928:21, 931:13-17; 932:12-19; Exhs. 246, 248, 249, 250, 252)  Mr. McDonald's testimony was credible and consistent with the documentary evidence.

41.     In April 2003, Dow processed a request for capital authorization to make necessary capital improvements at the Dalton plant to retrofit it for manufacturing G2G.  (Exh. 1004)  This request was approved by Dow management in November 2003.  (*Id.*)  The total capital request was for $2.3

-19-

1    million.  (Exh. 1004; Tr. 751:2-9)  Of this amount, $300,000 was for

2    pre-engineering work, and this pre-engineering work was completed.  (Tr.

3    751:15-22)

4           42.    As of July 2003, Dow had prepared a "PU Dispersion Asset

5    Map" outlining its plans for production of PUD at Dalton.  (Exh. 246)  This was a

6    detailed summary of how Dow intended to accommodate the different dispersions

7    at the two different production plants.  (Tr. 918:7-15; 920:25-921:3)  Based on this

8    analysis, Dow intended to begin production of G2G in the Dalton plant by early

9    July 2004.  (Exh. 246; 918:7-15)

10          43.    In September 2003, Mr. James met with Mr. Yap and the two

11   discussed the development of G2G.  (Exh. 354)  YTY was informed that G2G

12   would be available in January 2004, and that Dow would require an order for the

13   material.  (Tr. 116:13-19)

14          44.    In October 2003, Dow began gearing up for a production run of

15   G2G at the Freeport plant.  (Exh. 250; Tr. 930:25-931:6)  Dow intended to use the

16   information and experience gleaned from this run to outfit the Dalton plant for

17   G2G.  (Exh. 250; Tr. 932:1-19)  Also in October 2003, Dow had in place a

18   preliminary timeline for the Dalton plant capital project.  (Exh. 249; Tr.

19   925:12-927:3)

20          45.    In December 2003, Dow successfully ran a trial production run

21   of G2G at the Freeport plant.  (Tr. 932:1-19; Exh. 252)  Dow produced over

22   300,000 pounds of G2G for commercial sale.  (Exh. 252)  Yet, YTY did not issue a

23   purchase order for G2G until July 16, 2004.  (Exh. 1031)

24

25

26   **IV.    YTY'S CANCELS ITS PUD ORDERS AND RAW MATERIAL**

27        **PRICES ESCALATE**

28

-20-

46.     In December, 2003, YTY cancelled all of its then-outstanding orders for PUD.  (Tr. 667:1-8; 933:18-935:4)

47.     The market for PU gloves changed dramatically in late 2003 and early 2004.  First, Maxxim, which had been YTY's largest PU gloves customer (even during the course of Maxxim's bankruptcy proceedings), was purchased by Medline Industries, another glove company, in November 2003.  (Exh. 193; Tr. 111:5-16; 177:6-13; 178:2-5; 606:2-8; 846:13-846:20)  Medline stopped ordering as many PU gloves as Maxxim had previously ordered.  (Tr. 111:20-112:6; 178:2-5; 180:11-22; 606:9-12)  Second, the price of nitrile gloves, the closest competitor to PU gloves, decreased significantly from approximately $38 to $40 per case in early 2003 to $28 per case in mid-2004.  (Tr. 178:25-179:25; 180:8-10; Exh. 135)  This put tremendous price pressure on PU gloves.

48.     Dow attempted to help YTY boost its sales of PU gloves.  In February 2004, Stephen James and Michael Yap discussed Dow lowering the price of PUD to stimulate YTY's purchases of PUD (and its ability to sell PU gloves).  (Tr. 121:24-122:10; Exh. 356)  Steven English, the new head of New Business Development for Polyurethanes at Dow, agreed to the price reduction.  (Tr. 743:14-18; 753:4-754:4; Exh. 133)

49.     Dow agreed to lower the price of PUD to $1.13 per wet kilogram and lock that new price in for one year.  (Exh. 133; Tr. 230:3-5; 753:4-754:4)  This price decrease effectively gave YTY the $0.20 discount YTY claims it was promised by Mr. James on January 24, 2003.

50.     From February 2004 onwards, YTY never again paid more than $1.13 per wet kilogram for any of its purchases of PUD.  (Tr. 187:23-188:12; 998:25-999:3)

51.     Despite obtaining a price reduction in February 2004, YTY did not start ordering material quantities of PUD.  During the seven months from January through July, 2004, YTY ordered and took delivery of only three isotainers

-21-

of PUD (62,010 wet kilograms), in contrast to the 115 isotainers of PUD (2,381,000 wet kilograms) YTY had received during the preceding seven months from June through December 2003.  (Exh. 498)

52.  Based on YTY's cancellation of its PUD orders and the uncertainty of YTY's future orders, Dow placed on hold the capital project to retrofit the Dalton plant.  (Tr. 751:23-752:16; 933:18-934:7)  As explained by Mr. English, Dow made no further investments in Dalton because it could not justify investing in a plant that would site idle.  (Tr. 799:5-10)  Further, as of this time, YTY still had not ordered its trial container of G2G.  (Exh. 1031; Tr. 660:9-17; 932:20-933:4)

53.  Mr. James left Dow in mid-2004.  (Tr. 123:8-10)  John Livorness took over Mr. James' responsibilities with respect to the sale of PUD to YTY.  Mr. Livorness visited YTY on June 22, 2004 in Malaysia.  (Tr. 123:11-124:3; Exh. 135)  During this meeting, YTY explained to Mr. Livorness that the market for PU gloves had changed.  (Tr. 125:6-12; 126:8-15; Exh. 135)  YTY also informed Mr. Livorness that nitrile glove prices had dropped to $28 per case, and therefore in order to stay competitive, YTY would need a further reduction in the price of PUD to the range of $0.90 to $0.95 per wet kilogram.  (Exhs. 135, 136; Tr. 128:19-21)

54.  In response to YTY's request for further reductions in PUD pricing, Dow analyzed its then-current cost to manufacture PUD (i.e., its manufacturing costs in June 2004).  Mr. English directed Kari Dawson-Ekeland, the new PUD Asset Manager, to investigate the pricing for PUD to determine if Dow could sell PUD to YTY at the requested $0.90 to $0.95 per wet kilogram pricing.  (Tr. 757:20-758:3)

55.  Ms. Dawson-Ekeland analyzed the cost parameters for PUD in June 2004 and also brainstormed several options with respect to the glove PUD

business.[8]  (Tr. 784:25-785:2; Exh. 25)  Ms. Dawson-Ekeland prepared a memorandum and an email in late June 2004 that concluded that Dow's then current costs to make PUD exceeded the $0.90 to $0.95 per wet kilogram price YTY was requesting.  YTY makes much of the options identified in Ms. Dawson-Ekeland's email, Exhibit 25, which include "exit the business via price increase."  Yet, Exhibit 25 was written at a time when YTY was ordering virtually no PUD from Dow, and was requesting that Dow decrease the price of PUD yet again.  Ms. Dawson-Ekeland's recommendations at the end of the email do not suggest any intent by Dow to then exit the PUD business.  Instead, Ms. Dawson-Ekeland recommended giving notice to YTY of a price increase for PUD on December 1, 2004, so that the price increase could be implemented as of March 1, 2005, once the one-year commitment of the $1.13 price expired.  This was consistent with Dow's rights under the Sales Contract.  Ms. Dawson-Ekeland also recommended that Dow ask YTY if Dow could sell G2G to other glove manufacturers - i.e., give up the requirement that Dow only sell PUD to YTY. YTY rejected Dow's proposal with respect to a release from exclusivity.  (Tr. 760:14-21)  Dow in fact did not exit the PUD business at this time, but instead continued to offer to sell PUD to YTY at the then-agreed price of $1.13/wet kg. (Tr. 761:12-15)  Dow did conclude, however, that it could not decrease the price of PUD as YTY had requested.  (Tr. 761:16-19)

56.     The cost of raw materials used to make PUD increased substantially during the period from March 2003 to late 2004 and early 2005.  (Tr. 759:6-8)  The principal raw materials of PUD (G1G) were voranol (50 percent), polyglycol (14 percent), and MDI, also referred to as isonate (32 percent).  (Tr.

---

8/ Ms. Dawson-Ekeland reported to Mr. English.  (Tr. 516:21-24)  Her involvement with the glove PUD business began in June 2004.  (Tr. 521:10-14)   She had no involvement in the negotiations with YTY regarding the sale of the PU glove business and was not involved in setting the initial price for PUD of $1.33 per wet kilogram.  (Tr. 522:13-19; 812:6-8; 993:23-994:3)

762:1-21)  The standard cost for voranol increased from $296.52 (per 1000 pounds) in the first quarter of 2003 to $501 by the first quarter of 2005.  (Exh. 1057; Tr. 762:7-76:13)  The cost of polyglycol and MDI similarly increased.  (Exh. 1057; Tr. 763:17-764:2)  These increases in the cost of the raw materials for PUD directly impacted the cost to make PUD.  (Tr. 764:3-5)  The increases in the cost of these raw materials tracked the increase in the price of oil at that time, as voranol, polyglycol and MDI are all derived from hydrocarbons.  (Tr. 765:11-767:6)  Thus, changes in the price of oil impacted the cost to make PUD.  (Tr. 764:14-18)  The price of a barrel of oil was $22 in 2001 (at the time of the Contract Manufacturing Agreement), and $24 in 2003 (at the time of the sale of the business to YTY).  (Tr. 765:11-22; Exh. 1069)  The price of oil then increased rather dramatically to $37.71 in November 2004 (when Dow gave notice of the price increase) and to $48 in June 2005 (when Dow terminated the Sales Contract).  (*Id.*)

57.     In October 2004, Dow sent YTY a letter explaining the impact on the price of PUD of escalating raw material prices.  (Exhs. 123; 387)  Dow requested that YTY revert to the original contract price of $1.33 per wet kilogram in order to minimize the impact of future price increases.  YTY refused.  (Exh. 389; Tr. 770:16-25)

58.     On November 24, 2004, Dow gave notice to YTY of a price increase to $2.04 per wet kilogram for G1G PUD, effective March 1, 2005.  (Exh. 397)  This new price was considered just below "break-even" for Dow.  (Tr. 771:6-12; 996:24-997:14)  The price increase notification was given pursuant to the provisions of the Sales Contract.  This Court previously has found that Dow had the right under the Sales Contract to raise the price of PUD as long as Dow complied with the notice provisions of the Sales Contract (which it did).

59.     YTY would not agree to the $2.04 per wet kilogram price for PUD.  (Tr. 771:13-14)  The highest price YTY offered to pay for PUD was $1.54 per wet kilogram, but that offer was conditioned on Dow locking in that price for

-24-

two years.  (Tr. 580:23-25; 607:21-608:3)  Dow was under no obligation to accept this price, and did not do so.  Dow and YTY never reached agreement on a new price for PUD after Dow gave the notice of price increase to $2.04.  (Tr. 676:12-19; 772:4-9)

60.    Between January and May, 2005, Dow and YTY negotiated certain issues arising from a microbial contamination of certain PUD delivered by Dow to YTY.  YTY and Dow reached a settlement of their dispute regarding these quality issues in May 2005.  (Exh. 147)

61.    In June, 2005, Dow gave notice it was terminating the Sales Contract.  (Exh. 148)  Dow continued to offer to sell PUD to YTY on the spot market.  (Tr. 772:10-19)  Dow had the right under the Sales Contract to terminate if the parties could not agree on a price for PUD.

## V.    YTY BLAMED DOW FOR THE FAILURE OF THE PU GLOVE BUSINESS AND BROUGHT SUIT

62.    YTY filed its lawsuit against Dow on December 22, 2005, some 33 months after the purchase transaction closed.

63.    In its original complaint, YTY sought rescission of the Asset Acquisition Agreement based on allegations of misrepresentations and omissions concerning, *inter alia*, the PU glove business and the viability of Dow's key customer, Maxxim.  YTY's original complaint did not contain any reference to G2G or the Dalton plant.  YTY's original complaint also did not contain any allegation that the price for PUD set in 2003 was established incorrectly.

64.    In its First Amended Complaint, filed on May 8, 2007, YTY for the first time alleged that Dow made misrepresentations concerning its intentions to produce G2G and move production to the Dalton plant.

65.    In July 2007, this Court granted Dow's motion to dismiss YTY's claims for breach of fiduciary duty and constructive fraud, on the ground that no fiduciary relationship existed between the parties.

-25-

66.     On August 29, 2008 this Court issued an order granting in part and denying in part Dow's motion for summary judgment (the "MSJ Order").  In its MSJ Order, the Court dismissed the following claims from YTY's First Amended Complaint:  fraudulent concealment/non-disclosure; innocent misrepresentation; breach of contract; breach of the implied covenant of good faith and fair dealing; and promissory estoppel.  This Court concluded that Dow's conduct in increasing the price of PUD and ultimately terminating the Sales Contract were authorized by the express provisions of the Sales Contract.

67.     In the MSJ Order, the Court also granted Dow's motion in part with respect to YTY's claims for fraud and deceit and negligent misrepresentation.  As to these claims, this Court ruled that the only actionable statements alleged by YTY were:  (1) Dow's alleged statements that it intended to move production of PUD to the Dalton plant; and (2) Dow's alleged statements that it intended to produce G2G, and that these changes would occur within six to nine months and result in a $0.20 per wet kilogram price reduction on PUD.

68.     On February 24, 2009, YTY filed a formal notice of election, indicating its intent to proceed with its rescission claim in lieu of its claims for lost profits.

69.     At the pre-trial conference for this matter, YTY asserted that it intended to proceed on its rescission claim, and that its claim for rescission encompassed fraudulent misrepresentation and concealment, negligent and innocent misrepresentation, mistake, and failure of consideration.  YTY also submitted a new theory for rescission:  that the price for PUD agreed to in 2003, $1.33 per wet kilogram, was set *too low* and therefore was actionable.  After hearing argument by the parties, the Court allowed YTY to proceed on its rescission claims on the basis of two sets of theories:  (1) that during the negotiations, Dow misrepresented its plans to shift production to G2G at the Dalton plant, with both of these changes leading to a $0.20 per wet kilogram price

reduction; and (2) the initial price of PUD, $1.33 per wet kilogram, was set too low and not an accurate reflection of Dow's then-costs to make PUD.

## CONCLUSIONS OF LAW

### I.   YTY'S CAUSE OF ACTION FOR RESCISSION FAILS

YTY has failed to carry its burden of proof with respect to any of the bases upon which it seeks rescission.  While YTY regrets the transaction, and that the PU glove business did not succeed as it had hoped, Dow never guaranteed the success of the business.  Hindsight is not a basis for rescission.

### A.   YTY Has Not Shown it is Entitled to Rescission Based on Fraudulent Misrepresentation or Fraudulent Concealment

70.   To be entitled to rescission on the basis of a fraudulent misrepresentation, YTY must prove all of the following:  (1) Dow represented to YTY that an important fact was true; (2) Dow's representation was false; (3) Dow knew the representation was false when Dow made it, or Dow made the representation recklessly and without regard for its truth; (4) Dow intended that YTY rely on the representation; (5) YTY reasonably relied on Dow's representation; (6) YTY was harmed; and (7) YTY's reliance on Dow's representation was a substantial factor in causing its harm.  CACI 1900 (as modified); *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 (1997); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith*, 68 Cal. App. 4th 445, 482 (1998).  YTY must make its showing by a preponderance of the evidence.  Cal. Evid. Code § 115; *Liodas v. Sahadi*, 19 Cal. 3d 278, 288-90 (1977).

71.   At a minimum,  YTY has failed to show: (1) Dow represented to YTY that it intended to convert its PUD production from G2G and move production to the Dalton plant within six to nine months and this would result in a $0.20 price reduction on PUD; (2) that any alleged representations by Dow were material to YTY's decision to purchase the business; (3) that any alleged representations by Dow were false; (4) that Dow intended to defraud YTY; (5) that

-27-

1  YTY reasonably relied on any representations by Dow; or (6) that YTY was

2  harmed.

3         72.     First, YTY did not carry its burden of showing that Dow

4  represented to YTY it intended to convert to G2G and move production to the

5  Dalton plant within six to nine months and this would result in a $0.20 price

6  reduction on PUD.  While the Court believes the general subjects of converting to

7  G2G and shifting production to the Dalton plant were discussed at the January 24,

8  2003 meeting with Mr. James, the Court does not find credible the testimony of

9  YTY's witnesses that Mr. James made any affirmative representations that the

10 price of PUD to YTY would automatically decrease by $0.20 as soon as the shift

11 occurred.  The parties did not discuss the pricing of PUD on January 24, 2003,

12 leading to the inevitable question:  $0.20 would be discounted from what?

13 Moreover, the only contemporaneous notes of the January 24, 2003 meeting do not

14 reflect anything having been said about G2G, the Dalton plant or a price decrease.

15 There also is no evidence that any such statements were ever repeated by Mr.

16 James after the January 24, 2003 meeting.  While Mr. Oh testified Mr. James

17 repeated the alleged statements at the February 2003 testimony, Mr. Oh's

18 testimony at trial was not credible, as it was contradicted by both Messrs. Wan and

19 Lim and Mr. Oh's own prior deposition testimony.

20        73.     Even assuming, *arguendo*, Mr. James made the statements that

21 Dow intended to convert its PUD production from G1G to G2G and move

22 production to the Dalton plant, there has been no showing that these issues were

23 material to YTY's decision to purchase the PU glove business.  YTY's directors

24 made the decision whether or not to make an offer for the PU glove business within

25 10-20 minutes of Mr. James presenting them with the proposal.  At the time they

26 made this decision, the pricing for PUD had not been discussed.  YTY's directors

27 acknowledged they asked *no* questions about Dalton or G2G between January 24,

28 2003 and March 28, 2003 (when the transaction closed) and were never shown any

-28-

1  documents about the PU glove business by Dow.  Further, none of the

2  documentary evidence relevant to the transaction mentions a future shift in

3  production to G2G at the Dalton plant, with a concomitant price decrease.  The

4  Offer Letter (Exh. 17), the Letter of Intent and Term Sheet (Exh. 114), Sales

5  Contract (Exh. 53), YTY's Board Minutes (Exh. 217), YTY's 5-year budget[9]

6  (Exhs.232; 324), and YTY's banking application (Exh. 112) are all silent on this

7  issue.  Equally glaring is YTY's failure to raise either of its claims with respect to

8  the Dalton plant or G2G in its original complaint filed in this action.  In light of the

9  foregoing, the Court finds neither Dalton nor G2G were material to YTY's decision

10  to purchase the PU glove business.

11          74.    YTY also has failed to prove that any representations by Dow

12  were false at the time they were made, or that Dow had the requisite fraudulent

13  intent.  Overwhelming evidence leads to the conclusion that at the time of the

14  purchase transaction, Dow fully intended to proceed with the production of G2G

15  and move to the Dalton plant.  This intent is borne out by Dow's conduct, as well

16  as the numerous Dow memoranda in the months following the close of the

17  purchase transaction.  In April 2003, Dow processed a request for capital

18  authorization to make necessary capital improvements to the Dalton plant.  The

19  total request of $2.3 million was approved by Dow management in November

20  2003, and $300,000 was spent on engineering work.  Also, in July 2003 Dow

21  prepared a "PU Dispersion Asset Map" outlining its plans for production of PUD at

22  the Dalton plant, which showed G2G being produced at Dalton by early July 2004.

23  In December 2003, Dow produced 300,000 pounds of G2G in its Freeport plant, to

24  utilize the lessons learned for future production at the Dalton plant.  Dow's

25  witnesses credibly detailed the goals Dow had with respect to the Dalton plant and

26

27  9/  The $0.20 price deduction referenced in YTY's five year budget more reasonably relates to the volume adjustments, which were discussed and agreed to, rather than either G2G or the Dalton plant.

28

-29-

1    G2G, and the steps taken to achieve those goals.  It is true that, in the end, Dow did

2    not move production of PUD to the Dalton plant or produce additional G2G

3    material beyond its initial commercial production run.  But, Dow's plans changed

4    only after YTY cancelled all its existing orders for PUD in December 2003 and

5    ordered just three isotainers of the material between January and July 2004.  That

6    ultimately Dow did not move production to the Dalton plant because YTY ceased

7    purchasing PUD does not somehow make Dow's conduct nefarious in any way.

8    With respect to G2G, the evidence is clear that Dow did produce G2G and offer it

9    for sale to YTY.  Any delays in the delivery of G2G were caused by YTY's own

10   inaction.

11          75.     Further, even if any of the representations were made by Mr.

12   James, YTY's reliance on them was unreasonable.  For purposes of this element,

13   the reasonableness of YTY's reliance must be determined by taking into account

14   YTY's mental capacity, knowledge, and experience.  CACI 1908 (as modified).  If

15   YTY's conduct, in light of its own intelligence and information, was manifestly

16   unreasonable, it must be denied recovery.  *Alliance Mortgage Co. v. Rothwell*, 10

17   Cal. 4th 1226, 1239-40 (1995).  *See also Kruse v. Bank of America*, 202 Cal. App.

18   3d 38; 154 (1988); *General American Life Ins. Co. v. Castonguay*, 984 F.2d 1518,

19   1520-21 (9th Cir. 1993).  Here, YTY's reliance was not reasonable.  YTY asked no

20   questions prior to signing the contracts about either the Dalton plant or G2G.

21   Further, YTY knew that PUD was an oil-based product, and therefore could

22   fluctuate in price.  Despite this, YTY did not seek any protections against the

23   impact of such fluctuations on the price of PUD.  The pricing provision of the Sales

24   Contract is clear on its face in giving Dow the right to raise the price of PUD.

25   YTY's directors read it, understood it, and even negotiated an extension of the

26   negotiation period in the provision, but did not seek to include reference to a

27   mandatory price decrease arising from shift to either the Dalton plant or G2G.

28   Indeed, YTY did not ask that the Sales Contract (which includes an explicit

-30-

integration clause) reference production at the Dalton plant or G2G in any way. YTY is a sophisticated company, and at the time of the transactions, was owned 47.5 percent by 3i PLC, one of the largest venture capital firms in the United Kingdom. It had sufficient resources to conduct a due diligence review of the PU glove business, to seek further information about pricing for PUD, and to seek legal advice on the contracts. In fact, YTY did seek both 3i PLC's assistance in reviewing the contracts (Exh. 115) as well as the assistance of counsel. The last factor particularly is fatal to YTY's assertion of reasonable reliance. Prior to signing the contracts, YTY sent drafts of the agreements to its lawyers, SKYeoh & Partners. Ms. Kang, an attorney with that firm, reviewed the draft contracts and sent a detailed memorandum to YTY with comments and suggestions. Ms. Kang noted that there were "material issues" involved, and queried whether a due diligence had been conducted. Significantly on point, Ms. Kang suggested to YTY that it obtain fixed pricing. YTY's directors admit they ignored their attorney's counsel. That was not reasonable.

76.     Finally, as a matter of law, YTY is unable to show any causation or harm as a result of any of the alleged representations by Dow. YTY claims it was promised a $0.20 price reduction in the price of PUD six to nine months after the sale. And in fact, YTY *did* receive a $0.20 price reduction 10 ½ months after the sale. In February 2004, Dow voluntarily reduced the price of PUD by $0.20 per wet kilogram. After this date, YTY never again paid more than $1.13 per wet kilogram for PUD. Thus, any price reduction YTY claims it was promised, it received. Moreover, any "harm" YTY claims it suffered resulted from the lawful cancellation of the Sales Contract in July 2005, more than two years after YTY's acquisition of the PU glove business. That cancellation arose from the parties' failure to agree to a new price for PUD, a new price that was prompted by increases in raw material prices for PUD. Dow was within its rights to terminate the Sales Contract if the parties could not agree on a price for PUD. This absence

-31-

of causation is fatal to YTY's fraud claim.  *Kruse*, 202 Cal. App. 3d at 61.  YTY may not rescind when the harm it claims to have suffered was due to causes unrelated to the misrepresentation.  *Id.* at 60.  *See also Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818-19 (1996) (plaintiff could not establish requisite causal connection where its injury resulted not from alleged misrepresentations made in the inducement of contract, but from defendant's subsequent termination of contract).

77.     YTY's fraudulent concealment claim is the flip of its fraudulent misrepresentation claim.  YTY asserts Dow fraudulently concealed that it was not planning on moving to the Dalton plant or converting to G2G, and therefore YTY would not receive a $0.20 price discount.  To prevail on a claim of fraudulent concealment/non-disclosure on which rescission may be based, YTY must prove, by a preponderance of the evidence, that: (1) Dow concealed or suppressed a material fact from YTY; (2) YTY did not know of the concealed fact; (3) Dow intended to deceive YTY by concealing the fact; (4) YTY reasonably relied on Dow's deception; (5) YTY was harmed; and (6) Dow's concealment was a substantial factor in causing YTY's harm.  CACI 1903.  *See also Hahn v. Mirda*, 147 Cal. App. 4th 740, 758 (2007).  As with a fraud claim, the reasonableness of YTY's reliance must be determined by taking into account its mental capacity, knowledge, and experience.  CACI 1908 (as modified).

78.     For the same reasons articulated above with respect to fraudulent misrepresentation, YTY has not shown Dow fraudulently concealed its intentions with respect to the Dalton plant or conversion to G2G.  Specifically, YTY has not demonstrated: (1) Dow concealed any material facts from YTY with respect to either the Dalton plant or G2G (indeed, YTY never asked for details about either); (2) that either the Dalton plant or G2G was material to YTY's decision to purchase the PU glove business; (3) that Dow intended to deceive YTY;

-32-

(4) that YTY reasonably relied on Dow; or (5) that YTY was harmed as a result of the alleged concealment.

79.     It should be noted that YTY also argues Dow made a fraudulent misrepresentation with respect to the initial base price of PUD ($1.33 per wet kilogram), specifically, that this price was *too low* a price.  YTY contends Dow set a falsely low cost-competitive price in order to induce YTY into purchasing the PU glove business, all with the intent of then terminating the Sales Contract.  For many of the same reasons outlined with respect to YTY's claims as to the Dalton plant and G2G, YTY has failed to carry its burden of proof with respect to its "priced too low" theory.  First, any statements made that a price is "cost-competitive" are inactionable puffery.  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999), *aff'd in relevant part*, 352 F. 3d 367, 379 (9th Cir. 2003).  Second, the Court is unconvinced any statements were made at the January 24, 2003 meeting or afterwards as to the cost-competitiveness of PUD. The documentary evidence YTY has raised to support its claims are a series of outdated press releases, and refer to PUD as cost-competitive compared to other solvent based glove products.  Third, there has been no evidence presented that, at the time of the alleged statements, PUD was not cost-competitive.  Fourth, YTY has not presented any evidence of a fraudulent intent (or reckless disregard) on the part of Dow with respect to setting the price for PUD.  Dow's witnesses were credible in stating that the price of $1.33 per wet kilogram for PUD was appropriate and based on Dow's then costs for production.  It also defies logic to conclude that Dow falsely induced YTY to purchase the PU glove business based on an artificially low price for PUD, and then proceeded to not only sell PUD to YTY for two years, but voluntarily lowered the price even further.  Finally, in this regard, YTY's reliance also was not reasonable.  YTY was an experienced glove manufacturer who was familiar with the costs of raw materials, and the premium

-33-

1    nature of PU gloves compared to other gloves.  It had an attorney recommend fixed

2    pricing.  YTY did not heed its attorney's advice.

3        80.    YTY's rescission claim based on fraud is really one of

4    hindsight, and its unhappiness with its purchase of the PU glove business.  But, the

5    law does not impose liability for fraud simply because a person made investments

6    that may have turned out to be unprofitable or unwise.  *Vucinich v. Paine, Webber,*

7    *Jackson & Curtis, Inc.*, 803 F.2d 454, 460 (9th Cir. 1986).

8    **B.    YTY Has Not Shown It is Entitled To Rescission on the Basis of**

9    **Negligent or Innocent Misrepresentation**

10       81.    Under California law, to establish a claim for negligent

11   misrepresentation upon which rescission may be based, YTY must prove:  (1) Dow

12   represented to YTY that an important fact was true; (2) the representation was not

13   true; (3) Dow had no reasonable grounds for believing the representation was true

14   when it was made; (4) Dow intended that YTY rely on this representation; (5) YTY

15   reasonably relied on Dow's representation; (6) YTY was harmed; and (7) YTY's

16   reliance on Dow's representation was a substantial factor in causing its harm.

17   CACI 1903 (as modified).  *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986).  In

18   other words, negligent misrepresentation requires the same showing as fraudulent

19   misrepresentation, minus the intent element.  Thus, like with fraudulent

20   misrepresentation, the reasonableness of YTY's reliance must be determined by

21   taking into account its mental capacity, knowledge, and experience.  CACI 1908

22   (as modified); *Gray v. Don Miller & Associates, Inc.*, 35 Cal. 3d 498, 503-504

23   (1984).  If a defendant's belief "is both honest and reasonable, the

24   misrepresentation is innocent and there is no tort liability."  *Diediker v. Peelle*

25   *Financial Corp.*, 60 Cal. App. 4th 288, 297 (1997).

26       82.    Because YTY's negligent misrepresentation claim mirrors its

27   fraudulent misrepresentation claim (minus the intent element), it also fails.  YTY

28   has not proven Dow made any misrepresentations, either with intent or without

-34-

intent.  Indeed, there has been no showing that Dow lacked reasonable grounds, as of January 2003, to believe it would move PUD production to the Dalton plant or commence production of G2G.  All evidence points to the contrary -- that Dow indeed did so intend.  Additionally, YTY has not proven that a shift in production to the Dalton plant or conversion to G2G were material with respect to its decision to purchase the PU glove business.  YTY also has not proven any harm or causation arising from the alleged misrepresentations.  The analysis underlying YTY's failure to prove its negligent misrepresentation is outlined above with respect to YTY's fraud claims, and applies equally here.

83.   YTY also asserts it is entitled to rescission on the basis of innocent misrepresentation.  But, California law does not recognize a claim for "innocent misrepresentation."  *City of Atascadero*, 68 Cal. App. 4th at 482 ("[I]t is the element of fraudulent intent, or intent to deceive, that distinguishes [fraud] from actionable negligent misrepresentation and from nonactionable innocent misrepresentation."); *Edwards v. Lang*, 198 Cal. App. 2d 5, 13 (1961) (innocent misrepresentation not actionable where made neither fraudulently nor negligently).  This alone is sufficient to undermine YTY's claim for rescission.

84.   To the extent YTY relies on innocent misrepresentation as a basis for rescission, this claim is subsumed by its claims for rescission based on unilateral and mutual mistake.  *See, e.g., Merced County Mut. Fire Ins. Co. v. State of Calif.*, 233 Cal. App. 3d 765, 771-72 (1991) (mutual mistake may be based on an innocent misrepresentation); *Crocker-Anglo Nat. Bank v. Kuchman*, 224 Cal. App. 2d 490, 727 (1964) (innocent misrepresentation as ground for rescission is a type of "mistake"); *Kostelac v. United States*, 247 F.2d 723 (9th Cir. 1957) (discussing an "innocent misrepresentation" as supporting rescission under the theory of mutual mistake).  The Ninth Circuit has suggested, in dicta, that rescission may be granted on the theory of innocent misrepresentation only if (a) the misrepresentation is material; (b) concerns a material fact (*i.e.*, one that would be

-35-

taken into account by a reasonable person in deciding whether to enter the transaction); and (c) the rescinding party has actually and reasonably relied on the representation to his detriment in entering into the contract. *Reliance Finance Corp. v. Miller*, 557 F.2d 674, 680 (9th Cir. 1977) (dicta). The reasons why YTY has not carried its burden of proof with respect to these elements has been summarized in detail above, and applies to YTY's innocent misrepresentation theory as well.

C. **YTY Has Not Shown It is Entitled to Rescission on the Basis of Mistake**

85. To establish a claim for rescission based on mutual mistake, YTY must prove all of the following: (1) at the time the contracts were executed, both parties were operating under a mistake of fact; (2) the mistake was material to the transaction; (3) the mistake did not result from YTY's neglect of its legal duty; (4) YTY does not bear the risk of the mistake; and (5) YTY would not have entered into the contracts if it had known about the mistake. CACI 1331 (as modified); *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 283 (2001); Restatement (Second) of Contracts § 154; *Grenall v. United of Omaha Life Ins. Co.*, 165 Cal. App. 4th 188, 192-193 (2008). The mere fact that both parties are mistaken with respect to an assumption of fact does not, of itself, afford a reason for avoidance of the contract by the adversely affected party. Relief is appropriate only in situations where a mistake of both parties has such a material effect on the agreed exchange of performances so as to upset the very basis for the contract. Rest. 2d Contracts § 152, com. (a).

86. YTY's claim for rescission based on unilateral mistake requires it to prove all of the following: (1) YTY made a mistake regarding a basic assumption upon which it entered into the acquisition; (2) YTY's mistake had a material effect upon the agreed exchange of performances that is adverse to YTY; (3) YTY did not bear the risk of the mistake; and (4) the effect of YTY's mistake

-36-

1  was such that enforcement of the contract would be unconscionable.  *Donovan*, 26

2  Cal. 4th at 281; *Stewart v. Preston Pipeline, Inc.*, 134 Cal. App. 4th 1565, 1588

3  (2005).

4         87.    A "mistake of fact" is a mistake, not caused by the neglect of a

5  legal duty on the part of the person making the mistake, and consisting of (a) an

6  unconscious ignorance or forgetfulness of a fact past or present, material to the

7  contract or (b) belief in the present existence of a thing material to the contract,

8  which does not exist, or in the past existence of such a thing, which has not existed.

9  Cal. Civ. Code § 1577.

10         88.    While its theories have shifted throughout this case, at trial,

11  YTY based its "mistake" case on two purported mistakes.  First, YTY argued the

12  parties were mistaken that Dow would shift production to the Dalton plant and

13  convert to G2G.  Second, YTY argued Dow incorrectly set the $1.33 per wet

14  kilogram price for PUD and Dow and YTY (or just YTY) mistakenly believed this

15  was a cost-efficient and accurate price.

16         89.    With respect to both mistake theories presented at trial, YTY

17  did not show Dow and/or YTY made any mistakes of fact.  Further, the Court

18  concludes YTY did neglect its legal duties with respect to the alleged mistakes and

19  YTY bore the risk of any of the alleged mistakes.  Additionally, with respect to the

20  Dalton/G2G theory, YTY did not show that the issue was material to the

21  transaction or that YTY would not have entered into the contracts absent a

22  mistaken understanding as to Dow's plans for conversion to G2G and production at

23  the Dalton plant.  Stated simply, no mistakes justifying rescission were made.

24         90.    To support rescission, a mistake must be as to an "objective,

25  existing fact."  *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal.

26  App. 4th 1410, 1421 (1996); *see also Mosher v. Mayacamas Corp.*, 215 Cal. App.

27  3d 1, 5 (1989) (mistake of fact must be a mistake as to past or present facts about

28  which the parties are ignorant or mistaken); Rest. 2d Contracts § 152, com. (a)

-37-

(mistake that will support rescission does not include an "improvident act, including the making of a contract, that is the result of … an erroneous belief … [or] the erroneous predictions or judgments about future events; the mistake 'must relate to the facts as they exist at the time of the making of the contract.'"). Where a belief or assumption under which a contract is made is rendered mistaken by subsequent events, the mistake will not support rescission of the contract. *Mosher*, 215 Cal. App. 3d at 4-6; *Metropolitan Life Ins. Co. v. Kase*, 718 F.2d 306, 307-308 (9th Cir. 1983) (citing *Hultin v. Taylor*, 6 Cal. App. 3d 802, 806 (1970); *Holt v. Thomas*, 105 Cal. 273 (1894)). *See also Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123 (1966).

91. Neither Dow nor YTY made any legally tenable mistake of fact with respect to the acquisition. In terms of G2G production and the Dalton plant, first, a *future* move and conversion, coupled with a *future* cost savings is not a mistake of an <u>existing</u> fact. Second, the evidence is overwhelming that Dow intended to shift production to the Dalton plant and produce G2G, thereby undermining any purported mistake. In April 2003, Dow processed a request for capital authorization to make necessary capital improvements to the Dalton plant. The total request of $2.3 million was approved by Dow management in November 2003, and $300,000 was spent on engineering work. Also, by July 2003 Dow had prepared a "PU Dispersion Asset Map" outlining its plans for production of PUD at the Dalton plant, which showed G2G being produced at Dalton by early July 2004. In December 2003, Dow produced 300,000 pounds of G2G in its Freeport plant, to utilize the lessons learned for future production at the Dalton plant. Dow's witnesses credibly detailed the goals Dow had with respect to the Dalton plant and G2G, and the steps taken to achieve those goals.

92. With regards to YTY's claim of mistake as to the propriety of the initial base price for PUD of $1.33 per wet kilogram, the Court is not convinced that any mistake occurred. Dow's witnesses testified at length that they were

-38-

1   knowledgeable about the cost to produce PUD.  Mr. McDonald credibly testified at

2   length that he "absolutely" had a handle on the cost to manufacture PUD and

3   "knew exactly what our costs were the whole time."  He further testified that the

4   $1.33 per wet kilogram was reasonable and in line with Dow's costs in 2003.  Mr.

5   McGaugh provided similar testimony.  Dow's contemporaneous documents also

6   evidence the cost for PUD production to be $1.28 per wet kilogram in early 2002,

7   with the price decreasing pending certain improvements in production (which Mr.

8   McDonald testified were achieved).  Dow's internal documents just prior to the

9   sale of the business show an appropriate price range for PUD in the range of $1.12

10  to $1.22 per wet kilogram, which is consistent with the price negotiated with YTY.

11  Based upon the testimony of Dow's witnesses and the contemporaneous

12  documents, the Court is convinced there was no mistake made with respect to

13  setting the initial base price for PUD.

14          93.     Similarly, there was no mistake with respect to the volume

15  commitments in the Sales Contract.  Dow knowingly agreed to impose no

16  minimum purchase requirements for PUD for the first five years of the contract.

17  Dow made this decision in light of the reciprocal exclusivity provided for in the

18  Sales Contract.  Dow could only sell PUD to YTY and YTY could only purchase

19  PUD from Dow.  In light of this exclusivity, a minimum purchase requirement

20  would not be necessary (YTY legally could not purchase PUD elsewhere).  A risk

21  Dow bore was that, despite the exclusivity arrangement, YTY would not purchase

22  PUD.  A risk knowingly taken does not constitute a mistake.  *Mosher*, 215 Cal.

23  App. 3d at 6; *Grenall*, 165 Cal. App. 4th at 193.

24          94.     It is apparent that the mistake that YTY really complains of is

25  that the business did not succeed, *i.e.*, the parties were mistaken as to their

26  projections for the future sale of PU gloves and the volume of PUD that would be

27

28

-39-

ordered.[10]  This, however, does not justify rescission of the contracts.  Where parties to a contract attempt to predict a future course of events, "[t]he fact that their speculation did not forecast the exact pattern which events subsequently took does not provide the basis for a claim that they were acting under some sort of mistake."  *Kase*, 718 F.2d at 307-308.  Indeed, to allow rescission based on a mistaken belief as to future contingencies "would expose virtually any unprofitable contract to legal attack upon the later occurrence of unforeseen adverse events."  *Mosher*, 215 Cal. App. 3d at 5.  *See also American Nat. Ins. Co. v. Continental Parking Corp.*, 42 Cal. App. 3d 260, 267 (1974) ("If mistaken assumptions of prosperity can avoid contracts, few business agreements would survive an unexpected depression.").

95.     Further, even if some mistake had been made by the parties, YTY neglected its legal duties with respect to the mistake.  The record shows that YTY asked no questions about the Dalton plant or G2G, and did no due diligence with respect to the PU glove business.  YTY also ignored the recommendation made by its attorney to obtain fixed pricing.  YTY had both the opportunity and the obligation to protect itself against future price increases.  It chose not to do so.

96.     YTY bore the risks of any of the mistakes it claims occurred.  YTY bore the risk of mistake if:  (i) the risk was allocated to YTY by the contract;

---

10/  YTY makes the incorrect assertion that Dow developed the $1.33 per wet kilogram price for PUD based on an unreasonable projected volume of sales of 21 million pounds of PUD and a shift in production to the Dalton plant.  YTY, however, has not carried its burden of proof in this regard.  YTY ignores the testimony of Dow's witnesses who worked on the project and developed the $1.33 per wet kilogram price and the contemporaneous documents that reflect the PUD cost production.  Instead, YTY relies on an analysis done in 2004 by Ms. Dawson-Ekeland (who was <u>not</u> involved in establishing the initial base price for PUD) which concludes that, using <u>2004</u> raw material prices, YTY would have to order 21 million pounds of PUD to justify maintaining the then current price of $1.13 per wet kilogram.  Increases in raw material costs that occurred in 2004, which made maintaining the $1.33 price unviable, do not render Dow's 2003 price mistaken.

-40-

(ii) YTY was aware when the contract was made that it had limited knowledge regarding facts to which the mistake relates, but treated the limited facts as sufficient; or (iii) it is reasonable under the circumstances to allocate the risk to YTY. *Donovan*, 26 Cal. 4th at 283; Rest. 2d Contracts, § 154. Here, the record reflects that YTY asked no questions about how the price of PUD was established. Additionally, YTY rejected a pricing mechanism that would be tied to publicly available indices such that pricing would be transparent. The Sales Contract contained an explicit price increase provision. This provision gave Dow the unfettered right to raise the price of PUD with 90 days notice and a negotiation period. Regardless of what price the parties agreed to as the base price for PUD, YTY knew when it entered into the Sales Contract that Dow could raise that price. YTY was even told by its lawyers of the risk that the contract price might be increased. YTY knowingly accepted that risk when it signed the Sales Contract. YTY understood and agreed to this language, even knowing that PUD was an oil-based product and thus its price could fluctuate. YTY bore the risk that future changes in the costs of PUD production would result in a price increase for PUD. The kind of mistake that renders a contract voidable does not include mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk. *Stermer v. Board of Dental Examiners*, 95 Cal. App. 4th 128, 134 (2002); *Guthrie v. Times-Mirror Co.*, 51 Cal. App. 3d 879, 885 (1975).

97.     YTY's mistake claim, to the extent it relies on the shift in production to the Dalton plant and conversion to G2G, fails for the additional reason that YTY has not shown either of these anticipated future occurrences were material to its determination to purchase the PU glove business. As previously discussed, YTY's directors made the decision whether or not to make an offer for the PU glove business within 10-20 minutes of Mr. James presenting them with the proposal. At the time they made this decision, the pricing for PUD had not yet

-41-

1  even been discussed.  YTY's directors acknowledged they asked *no* questions

2  about the Dalton plant or G2G between January 24, 2003 and March 28, 2003

3  (when the transaction closed) and were never shown any documents about the PU

4  glove business by Dow.  Further, none of the documentary evidence relevant to the

5  transaction mentions a future shift in production to G2G at the Dalton plant, with a

6  concomitant price decrease.

7       **D.**     **YTY Has Not Shown It is Entitled to Rescission Based on a**

8                  **Failure of Consideration**

9        98.     Recovery for rescission on the basis of a failure of consideration

10  requires YTY to prove:  (1) that the consideration for YTY's obligation to perform

11  under the agreements failed, in whole or in part, through the fault of Dow; or (2)

12  the consideration for YTY's obligation to perform under the agreements became

13  entirely void for any cause.  Cal. Civ. Code § 1689(b)(2), (b)(3).  A failure of

14  consideration must be "material" or go to the "essence" of the contract before

15  rescission is appropriate.  *FDIC v. Air Florida System, Inc.*, 822 F.2d 833, 840 (9th

16  Cir. 1987); *Wyler v. Feuer*, 85 Cal. App. 3d 392, 403 (1978).  *See also Rano v. Sipa*

17  *Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) ("A breach will justify rescission …

18  only when it is 'of so material and substantial a nature that [it] affect[s] the very

19  essence of the contract and serve[s] to defeat the object of the parties.'")  "[T]he

20  law is well settled that a person is not entitled to rescind or abandon a contract for

21  an alleged breach of that contract when the breach does not go to the root of the

22  consideration."  *Toll Bros., Inc. v. Lin*, 615 F. Supp. 2d 1100, 1118 (N.D. Cal.

23  2009) (quoting *Karz v. Dept. of Porf'l and Vocational Standards*, 11 Cal. App. 2d

24  554, 557 (1936)).

25        99.     YTY's arguments for failure of consideration mirror the

26  arguments it presented for rescission on the basis of mistake.  In essence, YTY

27  contends the consideration for the business became void because (1) Dow did not

28  move production to the Dalton plant or convert to G2G or (2) the initial base price

-42-

for PUD at $1.33 per wet kilogram was an error.  As detailed above, there was no failure of consideration because the move to the Dalton plant and G2G were not material aspects of the transaction.  Further, YTY received any purported $0.20 price deduction, so the consideration for the transaction was not void.  That Dow later raised this price in light of increasing raw material prices, a price increase that was legally permissible, does not somehow undermine the consideration of the contract.

## II.   YTY IS NOT ENTITLED TO ANY DAMAGES

100.   In light of the foregoing, YTY is not entitled to any damages from Dow, nor is YTY entitled to rescission of the purchase contracts.

101.   For the foregoing reasons, judgment in favor of Dow is appropriate.  It is hereby ordered and adjudged that:  (1) judgment is entered in

-43-

1    favor of Dow; (2) YTY shall take nothing by way of its Complaint or First

2    Amended Complaint from Dow; and (3) Dow is awarded its costs of suit herein.

3

4
     DATED:  October 28, 2009
5

6    _____
     THE HONORABLE STEPHEN G. LARSON
7    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-44-